PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RAYMOND JAMES FINANCIAL
SERVICES, INCORPORATED,

*Plaintiff-Appellee,*

v.

THOMAS W. BISHOP; STEVEN H.
HAMANT; TIMOTHY E. SCANLON,

*Defendants-Appellants.*

No. 09-1038

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, Senior District Judge.
(3:07-cv-00028-REP)

Argued: October 27, 2009

Decided: February 22, 2010

Before WILKINSON, DUNCAN, and DAVIS,
Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Wilkinson and Judge Duncan joined.

## COUNSEL

**ARGUED**: Jay J. Levit, LAW OFFICE OF JAY J. LEVIT, Glen Allen, Virginia; Scott Gregory Crowley, Sr., CROW-

LEY & CROWLEY, Richmond, Virginia, for Appellants. Stephen Grey Cochran, HAIGHT, TRAMONTE, SICILI-ANO, FLASK & YEONAS, PC, Vienna, Virginia, for Appellee. **ON BRIEF:** Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellee.

## OPINION

DAVIS, Circuit Judge:

This is an appeal from an order of the district court vacating an award of compensatory damages rendered by an arbitration panel adjudicating claims pursuant to the rules of the National Association of Securities Dealers ("NASD").[1] The award was in favor of three financial advisors, Appellants Thomas W. Bishop ("Bishop"), Steven H. Hamant ("Hamant"), and Timothy E. Scanlon ("Scanlon") against the Appellee, Raymond James Financial Services, Inc. ("Raymond James"), a broker/dealer member of NASD. The Appellants contend that the district court erred in exceeding the narrow scope of review prescribed by the Federal Arbitration Act. *See* 9 U.S.C. § 10(a). We are mindful that *vacatur* of an arbitration award is, and must be, a rare occurrence because a federal court employs a standard of review "among the narrowest known at law." *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir. 1998). Nonetheless, we conclude, as did the district court, that this case presents one of those rare instances. Accordingly, for the reasons stated within, we affirm the judgment of the district court.

---

[1]NASD has been succeeded by FINRA ("Financial Industry Regulatory Association"), but the events material to this case occurred prior to the reincorporation of NASD as FINRA.

### I.

The Appellants are registered representatives working as financial advisors in the securities industry in the Richmond, Virginia, area. In early 2001, Bishop departed from his then-firm and entered into a written "Independent Sales Associate Agreement" with Appellee Raymond James Financial Services, Inc. ("Raymond James"), a registered broker/dealer. Bishop became the branch manager at a Raymond James Richmond office. At about the same time, apparently at Bishop's urging, Hamant and Scanlon each entered into a separate written "Financial Advisor Agreement" with Raymond James and practiced their trade out of the Richmond office headed by Bishop.

Each of the three agreements described the individual financial advisor as an "independent contractor." Moreover, each of the three agreements contained the following "Termination of Agreement" provision permitting any party to terminate the agreement on five days notice:

> Either party may terminate this Agreement by providing the other party no less than five (5) business days prior written notice of intent to terminate this Agreement. Given the unique transactional nature of the securities business, there is no need for a liquidated damages provision should either party voluntarily terminate the Agreement before the end of its term as neither party would be significantly damaged by such termination.

J.A. 274, 282, 290-91. The agreements contained no general arbitration provision;[2] as a member of NASD, however, Ray-

---

[2]Indeed, each of the agreements contained a forum selection clause reciting that "all legal proceedings under this Agreement will be held in Pinellas County, Florida." J.A. 278, 286, 297. The agreements also contained a provision for "Indemnification." The indemnification provision

mond James was required to resolve certain disputes with its registered representatives by arbitration.

During 2003, Raymond James received several serious complaints of misconduct from competing financial advisors with respect to the operation of the office headed by Bishop.[3] As a result of the mounting complaints, on April 27, 2004, Raymond James notified Bishop and his co-manager at the Richmond branch, Michael Finnie, that the branch would be closed and that their registrations with Raymond James were being terminated in five days. Raymond James acted specifically pursuant to the "Termination of Agreement" provision in its Independent Sales Associate Agreement. Raymond James left open the possibility that the representatives in the Richmond branch, including Appellants, could affiliate with another Raymond James branch. Indeed, Bishop's co-manager, Finnie, promptly re-affiliated with another Raymond James branch. On June 25, 2004, however, after a two-month extension of time by Raymond James in effecting the branch closing, the Appellants voluntarily terminated their respective agreements and they did not re-affiliate with Raymond James.[4]

---

provided, in part, that "[r]esponsibility under [the indemnification provision] shall, if not mutually agreed upon, be determined by arbitration before the NASD." J.A. 278, 288, 295-96. There is no suggestion in the record that any aspect of the award under review related in any manner to a claim for indemnification.

[3]On March 7, 2003, for example, Gary Stewart ("Stewart"), the branch manager at a competing broker/dealer, wrote to Raymond James to complain that Bishop had disclosed confidential information about Stewart and had otherwise engaged in unlawful and unethical behavior. (In 2004, Stewart filed an arbitration claim against Bishop and Raymond James alleging libel and tortuous interference.) Also, on May 28, 2003, Steve Tanton, another Richmond-area investment professional, filed a NASD arbitration claim against Raymond James, Scanlon, and Hamant for defamation, tortuous interference, conspiracy, and securities violations.

[4]The Appellants contend that they were impeded by Raymond James management officials in their efforts to re-affiliate with a different branch office.

Meanwhile, prior to the Appellants' resignations, a lawyer from Raymond James' legal department, Terrance Bostic, Esq., had assumed representation of the Appellants (jointly with his representation of Raymond James) in the NASD arbitration proceedings arising from some of the complaints lodged against the Richmond office staff. Such representation of the Appellants continued after the Richmond branch closed. In due course, the arbitration proceedings against Scanlon concluded in his favor while he was represented by Bostic, whereas Hamant personally paid $10,000 in respect to a NASD arbitration award against him. J.A. 262.[5]

The arbitration proceeding involving Bishop was ongoing as of December 1, 2004. On that date, Bostic withdrew as counsel for Bishop (while continuing as counsel to Raymond James) based on an incipient conflict of interest. Specifically, the conflict of interest arose when Raymond James discovered that someone had obtained unauthorized access to its computer system; legal action against Bishop was contemplated in connection with the incident.[6] In any event, within just a few days after Bostic withdrew from his representation of Bishop,

---

[5]The district court determined that the arbitration proceeding against Hamant concluded "favorably to [Hamant] while [he] was represented by the Raymond James in-house lawyer." J.A. 383. The Appellants have not challenged that finding by the district court before us. Nevertheless, before the arbitrators, Hamant had alleged that he personally paid a $10,000 award against him. It may well be that these two arbitration proceedings were separate and distinct proceedings.

[6]On November 30, 2004, Finnie, who had reaffiliated with another Raymond James office, received an automated email message that his password had been changed, although he had not changed his password. An internal investigation by Raymond James revealed that the password change originated from a computer in Bishop's new office. Accordingly, Raymond James concluded that Bishop or one of his colleagues had accessed Raymond James' computer system without authorization, changed Finnie's password, and gained access to customer records. Raymond James notified the Federal Bureau of Investigation about the incident.

the parties to the pending arbitration proceeding reached a global settlement resulting in no liability to Bishop.

## II.

In July 2005, the Appellants filed a consolidated arbitration demand against Raymond James pursuant to NASD rules. Specifically, the Appellants sought damages on the basis of the following legal theories: (1) wrongful discharge; (2) breach of contract; (3) tortious interference with contract; (4) common law and statutory conspiracy; (5) violation of the Virginia Retail Franchising Act; and (6) violation of "just and equitable principles of trade." Thereafter, Raymond James submitted its Answer, Affirmative Defenses, and Counterclaims, and a Motion to Dismiss, which the Appellants opposed.

On May 11, 2006, the arbitration panel denied Raymond James' Motion to Dismiss. Then, on December 12, 2006, following a hearing extending over several days, the arbitration panel found Raymond James liable. In its award, the arbitration panel summarized the Appellants' claims as follows:

> breach of fiduciary and legal duties; violation of just and equitable legal principles of trade; breach of promises and inducements; interference with, and unlawful termination of [the Appellants'] prospective economic advantages; interference with the performance of contractual promises and inducements; tortious and deceitful termination of [the Appellants'] legitimate and high business expectations; violation of statutory Virginia public policy set forth in Virginia code § 13.1-558; and common law and statutory conspiracy.

J.A. 353. The panel granted the following substantial compensatory damages to the Appellants: Bishop, $156,050; Hamant, $74,050; and Scanlon, $72,050. J.A. 354.

By way of explanation for its award, the panel cited Raymond James' "unauthorized practice of law [sic] by employing staff counsel to advise and represent [Appellants] in their individual capacities" in NASD arbitrations. J.A. 354. The panel also found that Raymond James failed to warn the Appellants that they were subjected to heightened scrutiny after Raymond James received complaints about them. *Id.* The panel further found that Bostic's withdrawal from Bishop's representation in the arbitration prejudiced "some or all [Appellants'] litigation interest and made their transfer to other Raymond James Financial Services, Inc. branch offices impossible as a practical matter." *Id.*

On January 12 and 18, 2007, Raymond James filed in the United States District Court for the Eastern District of Virginia a timely Motion to Vacate the Award, and an Amended Motion to Vacate, respectively. The Appellants filed timely Motions to Confirm the Award.

On July 26, 2007, the district court held a hearing. The court noted the lack of clarity in the arbitration panel's explanation for its award, and in particular, among other things, the peculiar manner in which the arbitration panel seemed to treat the claims of all three of the Appellants identically, although the factual circumstances and background as to Bishop, on the one hand, and Hamant and Scanlon, on the other hand, were quite different. When the district court asked counsel for the latter two to identify Raymond James' actionable conduct as to his clients (Hamant and Scanlon), counsel indicated that the actionable conduct was wrongful termination. When the court asked counsel how any termination could be "wrongful" in light of the "Termination of Agreement" provision included in each written agreement, which on its face provided for termination at-will on five days notice, counsel argued that the law in the NASD securities industry requires that, irrespective of the parties' agreement, termination of a registered representative could only be for cause.

Ultimately, despite its best efforts to discern some coherence in the award, the district court concluded that it could not do so and remanded the matter to the arbitration panel.[7] Appellants filed an interlocutory appeal to this court from the district court's remand order. On April 2, 2008, we dismissed the appeal for lack of jurisdiction.

On April 11, 2008, the arbitration panel issued a supplemental letter opinion in response to the district court's remand order. Therein, the arbitrators stated the following bases for its award:

> (1) Raymond James provided legal representation to the Appellants "in a matter involving a business relationship between the employer and [the Appellants] that was also adversarial with a clear conflict of interest;" (2) Raymond James' "attorney favored the interest of [Raymond James] to the disadvantage of the [Appellants,] who were also his clients;" (3) "if a corporation employs a lawyer to provide legal services that corporation is then engaged in the practice of law. . . . As such, it is held to the same standard as a law firm and owes to its client the highest degree of fiduciary duty. If it chooses to engage in the business with such clients, it is obligated to place the interest of those clients ahead of its own. [Ray-

---

[7]The court found it "dubious" that Raymond James engaged in the "unauthorized practice of law" simply by permitting in-house counsel to represent the Appellants in arbitrations initiated by third parties jointly against Raymond James and its registered representatives. J.A. 394-400. Furthermore, the court questioned the arbitration panel's finding that Raymond James had assumed the role of legal counsel for Appellants and was therefore "held to the highest [of] ethical obligations and fiduciary duties." J.A. 116. The court reasoned that since Bostic, and not Raymond James, represented the Appellants, any fiduciary duty owed to the Appellants was owed only by him. In short, given the lack of clarity in the award, the court found it impossible to conduct meaningful, even if limited, judicial review.

mond James] failed in that obligation and the [Appellants] suffered losses pertaining to the issues for which [Raymond James] provided its lawyer."

J.A. 362-63.

On April 24, 2008, Raymond James filed a Renewed Motion to Vacate in the district court. Then, in a June 4, 2008 letter, the arbitration panel supplemented its supplemental opinion, stating that "[t]he unauthorized practice of law was one among other factors considered by the panel and that considering the case as a whole [it] believes the liability decision to be just and appropriate." J.A. 365.

After further briefing by the parties, the district court issued its Memorandum Opinion on December 18, 2008. The court summarized its earlier reasoning that had prompted it to remand the matter to the arbitration panel. J.A. 380-91. The court went on to find that "[l]ike the original award, the letters of clarification are not really very clear at all respecting the legal basis for the finding of liability. Nor do they articulate the causal link between the perceived liability and the monetary award." J.A. 391.

Noting that the arbitration panel had expressly stated that "any and all claims [sic] relief not specifically addressed herein, including Claimants' requests for punitive damages, are denied," J.A. 388 (quoting arbitration award, J.A. 354), the district court concluded that the following legal theories had been rejected by the arbitration panel: "breach of promises and inducements; interference with the performance of contractual promises and inducements; violation of statutory public policy set forth in Va. Code § 13.1-558; [and] common law and statutory conspiracy." J.A. 389. Consequently, the court concluded, the award must have been based on one or more of the following theories: "breach of fiduciary and legal duty; violation of just and equitable principles of trade;

and interference with, or unlawful termination of, [the Appellants'] respective economic advantage." *Id.*

The court identified the precedents from this court setting forth the statutory and extra-statutory grounds on which an arbitration award might be found infirm. Under the Federal Arbitration Act, it noted, an award may be vacated where the arbitrator "exceeded his powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made." *See* 9 U.S.C. § 10(a)(4). Moreover, consistent with longstanding precedent in this circuit, the court observed that an award might be vacated on extra-statutory grounds where an arbitrator displayed a "manifest disregard of the law" and where the award "failed to draw its essence" from the parties' agreement. J.A. 394-411.

Ultimately, the court concluded that the award here should be vacated on all three grounds. First, the court concluded that the arbitration panel exceeded its powers as proscribed by § 10(a)(4). This conclusion was grounded in the court's determination that the arbitrators clearly based their award of compensatory damages to the Appellants on Raymond James' alleged "breach of fiduciary and legal duties" surrounding the termination of their affiliation with Raymond James. Consequently, the court analyzed the award under *Zandford v. Prudential-Bache Secs., Inc.*, 112 F.3d 723 (4th Cir. 1997), and concluded the arbitrators clearly exceeded the authority granted them by that case to adjudicate a dispute "arising out" of the termination of a financial advisor in the securities industry. The court found this alone to be reason enough to vacate the award.

Next, the court concluded that, even assuming a claim for "breach of fiduciary duty" could be prosecuted separately from the Appellants' claim of "wrongful termination," the panel demonstrated a "manifest disregard of the law." This conclusion was based on the court's finding that the arbitrators were aware of and understood the legal maxim that,

under Florida law (which the parties agree governs the written agreements at issue), in order for a claimant to recover on a claim of breach of fiduciary duty, the claimant must have suffered damages.[8] J.A. 408 (citing *Patten v. Winderman*, 965 So. 2d 1222, 1224 (Fla. Dist. Ct. App. 2007)). Thus, the court found that the arbitrators were aware of the law, understood it correctly, and found it applicable to the case before them. The court found that the arbitrators knowingly failed to apply the law here, however, because the only evidence of damages presented to the arbitration panel related to their alleged "wrongful termination" by Raymond James and not to any "breach of fiduciary duty."[9]

Finally, the court concluded that the award "failed to draw its essence" from the written agreements between the parties because the arbitrators either disregarded or modified unambiguous contract provisions or based the award on their own personal notions of right and wrong. That is, the court concluded that the written agreements between the parties were termination-at-will contracts. The arbitration panel's award, however, inappropriately seemed to compensate the Appellants for termination of their employment. Accordingly, the court held that any damages award based on the termination of the Appellants' affiliation with Raymond James or their

---

[8]The court noted the following: (1) that Raymond James correctly informed the panel of the controlling legal doctrine (in its Motion to Dismiss); (2) that the arbitrators are licensed attorneys and should know this basic principle of law; and (3) that the arbitrators acknowledged the principles and necessity of demonstrating damages. J.A. 408.

[9]Specifically, the court found that the Appellants suffered no injury or damage as a consequence of their representation by in-house counsel: Hamant and Scanlon's arbitration proceedings were resolved in their favor, and the arbitration was settled with no liability to Bishop. As to whether Raymond James violated a "fiduciary duty" by failing to inform the Appellants that they were placed under "heightened supervision" as a result of the complaints about the Richmond branch, the court found that no such duty was owed to Appellants and, implicitly, that the arbitration panel exceeded its power to the extent it purported to identify any such duty.

inability to transfer to another Raymond James branch would have to be vacated.

Ultimately, the court concluded that to the extent the panel's award was based on a breach of fiduciary duty, the mere fact that Raymond James' in-house counsel provided representation to the Appellants in the third-party arbitration proceedings did not transmute Raymond James "into a law firm." J.A. 403. The district court recognized that the arbitration panel was not required to state the reasons for its award, but that it had voluntarily done so. And, given that the panel's award had no basis in law, the court found that the panel's award merely reflected the panel's personal views of right and wrong. Even if there was a breach of some duty, the court found no discernable damage caused by this breach.

Accordingly, Raymond James' Renewed Motion to Vacate was granted and the award was vacated. The Appellants have timely appealed and we have jurisdiction pursuant to 28 U.S.C. § 1291.

III.

We review the district court's findings of fact for clear error and its conclusions of law, including its decision to vacate an arbitration award, *de novo*. *Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC*, 519 F.3d 200, 207 (4th Cir. 2008) (citation omitted). We review the court's decision to remand an award to an arbitrator for abuse of discretion.

As we have made clear repeatedly:

> Judicial review of an arbitration award in federal court is "substantially circumscribed." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006). In fact, the scope of judicial review for an arbitrator's decision "is among the narrowest known at law because to allow full scrutiny of such

awards would frustrate the purpose of having arbitration at all-the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir. 1998). Indeed, as we have emphasized, in reviewing such an award, "a district or appellate court is limited to determine whether the arbitrators did the job they were told to do-not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 146 (4th Cir. 1994) (internal quotation marks omitted).

*Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007).

## IV.

On appeal, the Appellants emphasize the highly circumscribed standard of federal courts' review of arbitration awards. They argue that, although no error by the arbitration panel is shown in any event, at most what the record shows are mere errors of fact and/or of law which provide no basis for judicial intervention. They argue, further, that when the parties submitted their dispute to the process of arbitration, they agreed to accept the arbitration award as final, save extraordinary circumstances. The Appellants argue that no such extraordinary circumstances existed here. Raymond James urges affirmance on any or all of the grounds identified by the district court. We conclude that Raymond James has the better of the argument and find that the award cannot withstand the deferential review mandated by 9 U.S.C. § 10(a).

## A.

We conclude first that the district court did not abuse its discretion in remanding the award to the arbitration panel for

clarification of the bases of the award. Like the district court, we believe the original award is sufficiently inscrutable that it was reasonable to seek clarification of the basis for the award from the arbitration panel. It is true, of course, that an arbitrator need not explain her award. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597-98 (1960). Furthermore, we are mindful of a potential danger in such remands: "courts must approach remand to the arbitrator with care lest the arbitrator believe that a 'remand' is equivalent to 'retrial' with an expectation of an opposite result the second time around." *Randall, a Div. of Textron, Inc. v. Lodge No. 1076, Int'l Ass'n of Machinists and Aerospace Workers*, 648 F.2d 462, 468 (7th Cir. 1981). At the same time, however, as one court has noted, "[r]emand to an arbitrator for clarification and interpretation is not unusual in judicial enforcement proceedings." *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 n.1 (9th Cir. 1982.).

Given the evident incoherence of the explanation that was volunteered by the arbitration panel in this instance, we do not fault the district court in its commendable efforts to seek guidance through a remand, guidance that would enable the court to conduct the limited judicial review to which Raymond James was entitled.

> [O]nce the reasons that are given [by an arbitrator] strongly imply that the arbitrator may have exceeded his or her authority under the submission and contract whether that implication appears in the form of vague or inconsistent results or possible extensions beyond the terms of the contract the device of remand is appropriate to avoid having courts rather than the arbitrator clarify the bases for the initial determination.

*Randall*, 648 F.2d at 468.

## B.

As described above, the Appellants crafted a veritable smorgasbord of legal theories in support of their quest for compensatory damages. This seems to have been a sound tactic. Nevertheless, the record is clear that the Appellants have insisted throughout these proceedings that the gravamen of their claims for damages was an alleged "wrongful termination" of their affiliations with Raymond James. To be sure, on the face of the record, it is exceedingly obscure, to say the least, as to how a wrongful termination might arise (1) inasmuch as their respective agreements with Raymond James were independent contractor agreements containing the "Termination of Agreement" provision quoted above in Part I of this opinion, and under circumstances in which (2) the Appellants voluntarily terminated the agreements themselves.

Notwithstanding that the Appellants' fundamental claim was one for wrongful termination, we agree with the district court that the award in this case cannot be understood as based on anything other than the arbitrators' finding that Raymond James committed a breach of "fiduciary and legal duties" when its in-house lawyer, Bostic, provided legal representation to the Appellants in third-party arbitration proceedings. J.A. 389. In so concluding, the arbitration panel clearly "exceeded [its] power" within the contemplation of 9 U.S.C. § 10(a)(4).[10]

---

[10]The Federal Arbitration Act provides that a federal court may vacate an arbitration award on the following grounds:

> (1) the award was procured by corruption, fraud, or undue means; (2) partiality or corruption in the arbitrators; (3) the arbitrator was guilty of misconduct or misbehavior in conducting the hearing in a manner which prejudiced a party's rights; or (4) the arbitrator exceeded his powers, or so imperfectly executed them, that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

The Appellants correctly contend that, although the parties' agreements allowed Raymond James to terminate each agreement without cause and at will, all of the parties here were covered by former NASD Rule 10101.[11] Rule 10101 provides a measure of protection for registered representatives affiliated with broker/dealers such as Raymond James. It was on the authority of the expansive language of Rule 10101 that the Appellants asserted their claims against Raymond James.

In *Zandford v. Prudential-Bache Securities, Inc.*, we examined the scope of claims asserted under New York Stock Exchange Rule 347 ("NYSE Rule 347"), which, in language identical to that in Rule 10101, provided for arbitration of "[a]ny controversy . . . arising out of the employment or termination of employment" of registered representatives. 112 F.3d 723 (4th Cir. 1997).

Prudential terminated Zandford, one of its registered representatives, and commenced an arbitration against Zandford to recover payment of an outstanding loan. *Id.* at 725. Zandford counterclaimed. *Id.* The parties reached a settlement agreement. Thereafter, alleging that Prudential had breached the settlement agreement, Zandford brought an action in federal court, alleging contract and tort claims against Prudential. *Id.* at 726. The federal district court ordered arbitration of Zandford's claims, and an arbitration award favored Prudential. Zandford returned to court seeking to vacate the award; instead, the district court confirmed the award. *Id.*

Upon Zandford's appeal to this court from the confirmation of the award, we affirmed and held that all of Zandford's tort

---

[11]The current version of former NASD Rule 10101 is now a part of the Financial Industry Regulatory Authority, Inc.'s "Code of Arbitration Procedure." The operative language is unchanged; it provides, in relevant part: "for the arbitration of any dispute, claim, or controversy . . .arising out of the employment or termination of employment of associated person(s) with any member . . . (b) between or among members and associated persons."

and contract claims were covered by the NYSE Rule 347 arbitration clause because they arose out of Zandford's employment with Prudential. *Id.* at 729-30.[12]

We adopted a test fashioned by the Eighth Circuit and embraced by many courts to hold that arbitration of a dispute is required — i.e., that a dispute "arises out of employment or termination of employment," where the claims "involve significant aspects of the employment relationship, including but not limited to explicit contractual terms." *Id.* at 728-29 (quoting *Morgan v. Smith Barney, Harris Upham & Co.*, 729 F.2d 1163, 1167 (8th Cir. 1984)). Under *Morgan*'s "significant aspects" test, the source from which arbitrable disputes arise is not "the employment (or termination of the employment) contract" but "simply employment or termination of employment." *Id.* at 729 (citing *Morgan*, 729 F.2d at 1167). We reasoned that "the proper question is whether resolution of the claim depends upon evaluation of a party's performance either as a broker or as an employer of brokers during the time of the contractual relationship." *Id.* at 729 (citing *Aspero v. Shearson American Express, Inc.*, 768 F.2d 106, 109 (6th Cir. 1985); *Fleck v. E.F. Hutton Group, Inc.*, 891 F.2d 1047, 1053 (2d Cir. 1989)).

In the case before us, the district court applied *Zandford* and concluded that issues surrounding Raymond James' alleged "practice of law" and the resulting alleged breach of "fiduciary and legal duties" did not fit within the framework of arbitrable claims under the Rule 10101 analogue to NYSE Rule 347. Thus, it determined that the arbitrators lacked the

---

[12]Although, unlike the facts here, Zandford's agreement with Prudential contained an arbitration clause, the releases exchanged in connection with the settlement agreement had extinguished the parties' rights and duties under the employment agreement. *See* 112 F.3d at 727 ("[I]t is clear and indeed not disputed that Zandford cannot be called upon to arbitrate any matter on the authority of the arbitration clause included in the employment agreement."). Thus, the NYSE rule was the sole source of any duty to arbitrate and of the power of the arbitrators to adjudicate claims.

authority to address this "cause of action," the very claim on which the panel premised the award of compensatory damages to the Appellants.

We agree with the district court. As we have noted, here the arbitrators based their award on Raymond James' alleged breach of "fiduciary and legal duties" in connection with their joint representation with Raymond James by Bostic, the in-house lawyer. Under the *Zandford* "significant aspects" test, the appropriate question here "is whether resolution of the claim depends upon evaluation of a party's performance either as a broker or as an employer of brokers during the time of the contractual relationship." 112 F.3d at 729 (citations omitted). The panel's assertion that Raymond James acted improperly as a "lawyer" is inconsistent with the notion that Raymond James was acting as an "employer of brokers during the time of the contractual relationship." There is nothing whatsoever in the serial explanations provided by the arbitration panel to support the conclusion that the legal theory the panel found sustained required an evaluation of any party's "performance." Even after the district court ordered a remand to the panel, the panel simply reiterated what seemed inescapable from the original award: that the panel had adjudicated a tort claim that fell outside of the expansive interpretation of "arising out of employment" we adopted in *Zandford*.

Thus, the arbitration panel committed no mere error of law. Rather, by rendering an award whose underlying legal basis exceeded the bounds of arbitrable employment-related disputes cognizable under NASD Rule 10101 as interpreted (by analogy) in *Zandford*, the panel "exceeded [its] powers" under 9 U.S.C. § 10(a)(4).[13]

---

[13]The Supreme Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), has generated considerable uncertainty among the lower federal courts as to the continuing viability of extra-statutory grounds for vacating arbitration awards. *See Andorra Svcs. Inc., v. Venfleet, Ltd.*, No 08- 4902, 2009 WL4691635, at *4 n.5 (3d Cir. Dec.

### C.

The Appellants seek to avoid this result with two arguments, each of which we find unpersuasive. First, they seem to contend that once the arbitration panel's "jurisdiction" was established pursuant to Rule 10101, the panel was entitled under the expansive rubric of "just and equitable principles of trade" to interpret the propriety of Raymond James' overall conduct towards the Appellants.[14] Thus, according to the Appellants, the acts and omissions of Raymond James' in-house lawyer in undertaking joint representation of the Appellants in the NASD arbitration proceedings was a fair ground

10, 2009) ("Our sister circuits have expressed varying views on the impact of *Hall Street*. *Compare Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 407 n.6 (2d Cir. 2009) ("[W]e [previously] read Hall St. to hold that the FAA set forth the 'exclusive' grounds for vacating an arbitration award, and that the term 'manifest disregard' was merely a 'judicial gloss' on some of those grounds."), *with Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009) ("[T]o the extent that manifest disregard of the law constitutes a nonstatutory ground for vacatur, it is no longer a basis for vacating awards under the FAA.")). In view of our conclusion that the district court's order vacating the award in this case should be affirmed under 9 U.S.C. § 10(a)(4), we find it unnecessary to consider the effect of *Hall Street*.

[14]Congress imposed a "just and equitable principles of trade" requirement in the Exchange Act of 1934. *See* 15 U.S.C. § 78f(b). As the so-called "J & E" rule, NASD codified the principle in its Rule 2110: "A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." The J & E Rule is a mainstay in private and governmental enforcement efforts in the policing of securities markets, and is universally regarded as imposing high *ethical* standards on commercial actors in the market. *See, e.g.*, *In the Matter of the Application of Timothy L. Burkes*, 51 S.E.C. 356, 1993 WL 119769, at *3 (Apr. 14, 1993) ("As the Commission has stated previously, disciplinary hearings to require compliance with 'high standards of commercial honor and just and equitable principles of trade' are ethical proceedings; hence the concern is with ethical implications of the Applicant's conduct."). Contrary to the Appellants' suggestion, the J & E principle did not expand the powers of the arbitration panel in this case beyond the boundaries set by *Zandford*.

for decision and for an award of compensatory damages, regardless of how attenuated such acts and omissions might be from any party's "performance either as a broker or as an employer of brokers during the time of the contractual relationship."[15] We reject this contention as flatly inconsistent with our holding in *Zandford*.

Second, the Appellants contend that, under the reasoning in two cases from the Seventh and Eighth Circuits, because Raymond James was required under Rule 10101 to arbitrate claims "arising out of" the termination of Appellants' affiliation, it simply lacked the authority to terminate their affiliations without cause. *See Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 313 (7th Cir. 1981) ("It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for 'just cause.'"); *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 352 (8th Cir. 1995) (stating that "[NASD arbitration] necessarily alters the employment relationship from at-will to something else-some standard of discernable cause is inherently required in this context where an arbitration panel is called on to interpret the employment relationship").

The genesis of the principle applied in those cases was in the context of arbitration provisions contained in collective bargaining agreements. *See Liang*, 653 F.2d at 312-13 (citing *Int'l Ass'n of Machinists v. Campbell Soup Co.*, 406 F.2d 1223, 1226-27 (7th Cir.), *cert. denied*, 396 U.S. 820 (1969); *Amoco Oil Co. v. Oil, Chemical & Atomic Workers Int'l Union*, 548 F.2d 1288, 1294 (7th Cir.), *cert. denied*, 431 U.S. 905 (1977)). As to such disputes, as often as not, the issue before the arbitrator is whether a discharged employee should be reinstated, and if so, on what conditions. *See, e.g., Lynchburg Foundry Co. v. United Steelworkers of Am.*, 404 F.2d 259, 261 (4th Cir. 1968) ("When an arbitrator is commis-

---

[15]At oral argument, counsel for the Appellants described the practice-of-law issue as a "stepping stone."

sioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies."). The propriety of applying the principle in the judicial review of arbitration awards under Rule 10101 is less than clear. In any event, in neither of the cases relied on by the Appellants was the court faced with an express agreement providing for termination at will.[16] Accordingly, whether or not we believe those cases announced a rule of general application, we decline to follow them under the circumstances of this case.

## V.

As we acknowledged at the outset of this opinion, *vacatur* of an arbitration award by a federal court is rare, as it should be. We are satisfied that the district court did not err in concluding that this case presents such a rare occasion. Accordingly, the judgment of the district court is

---

[16]Indeed, the Eighth Circuit's *Agron* opinion demonstrates that the case is easily distinguishable from the case before us:

> If Agron's employment was purely at-will, the arbitration procedure designed to interpret that employment relationship would serve no identifiable purpose. Accordingly, the arbitration panel had the power to determine whether the firing was justified. *PaineWebber has not shown that the arbitrators' power was expressly limited to application of the Kansas at-will doctrine by the terms of the employment agreement, promissory note, or any other factor. Rather, PaineWebber merely contends that the panel's disposition improperly disregarded Kansas law.* Accordingly, we are powerless to upset the award.

49 F.3d at 352 (emphasis added). In contrast, the agreements at issue in this case expressly provide for termination at will, i.e., on five days notice. Furthermore, in light of the availability of numerous federal and state statutory claims available even to at-will employees, *see, e.g.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and to independent contractors, *see* 42 U.S.C. § 1981, it simply is not the case that "an arbitration procedure designed to interpret [such an] employment relationship would serve no identifiable purpose."

*AFFIRMED.*