**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1077

INTERACTIVE BROKERS LLC,

Plaintiff – Appellee,

v.

ROHIT SAROOP; PREYA SAROOP; GEORGE SOFIS,

Defendants – Appellants.

-------------------------------------------------------------------

PUBLIC INVESTORS ARBITRATION BAR ASSOCIATION; UNIVERSITY OF MIAMI SCHOOL OF LAW INVESTOR RIGHTS CLINIC; ELISABETH HAUB SCHOOL OF LAW AT PACE UNIVERSITY INVESTOR RIGHTS CLINIC; ST. JOHNS UNIVERISTY SCHOOL OF LAW SECURITIES ARBITRATION CLINIC; BETTER MARKETS, INC.; CORNELL SECURITIES LAW CLINIC,

Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:17-cv-00127-REP)

Argued: May 29, 2020                                        Decided: August 12, 2020

Before NIEMEYER, MOTZ, and AGEE, Circuit Judges.

Vacated and remanded with instructions by published opinion. Judge Motz wrote the majority opinion, in which Judge Agee joined. Judge Niemeyer wrote a dissenting opinion.

**ARGUED:** Samuel B. Edwards, SHEPHERD SMITH EDWARDS & KANTAS LLP, Houston, Texas, for Appellants. William H. Hurd, TROUTMAN SANDERS LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Edward E. Bagnell, Jr., Hugh M. Fain, III, Patricia B. Turner, SPOTTS FAIN, PC, Richmond, Virginia; David W. Miller, SHEPHERD SMITH EDWARDS & KANTAS LLP, Houston, Texas, for Appellants. Stephen C. Piepgrass, James K. Trefil, TROUTMAN SANDERS, LLP, Richmond, Virginia, for Appellee. Jordan E. McKay, MICHIEHAMLETT PLLC, Charlottesville, Virginia, for Amicus Public Investors Arbitration Bar Association. Andrew Whiteman, WHITEMAN LAW FIRM, Raleigh, North Carolina, for Amici University of Miami School of Law Investor Rights Clinic, Elisabeth Haub School of Law at Pace University Investor Rights Clinic, and St. John's University School of Law Securities Arbitration Clinic. Dennis M. Kelleher, Stephen W. Hall, Jason Grimes, BETTER MARKETS, INC., Washington, D.C., for Amicus Better Markets, Inc.

DIANA GRIBBON MOTZ, Circuit Judge:

After several investors suffered significant losses during a period of market volatility, they filed an arbitration claim against their broker, seeking compensation for the losses. When the arbitrators found for the investors, the broker asked the district court to vacate the award. The court ordered the arbitrators to clarify the award and, after the arbitrators did so, vacated the modified award. The investors appeal, and, for the reasons that follow, we vacate the judgment of the district court and remand with instructions to confirm the modified arbitration award.

I.

On June 18, 2012, and October 15, 2012, Rohit Saroop, Preya Saroop, and George Sofis (together, "Investors") opened accounts with Interactive Brokers ("Broker"), an online broker-dealer that provides an internet platform for investors to buy and sell securities. The Broker drafted the governing contracts, which the Investors signed. Each contract includes a mandatory arbitration provision and a choice-of-law provision specifying Connecticut law. The contracts also provide that "[a]ll transactions are subject to rules and policies of relevant markets and clearinghouses, and applicable laws and regulations."

The Investors hired a third-party investment manager to trade securities on their accounts. The manager, who now appears to be judgment proof, invested in an exchange-traded note, iPath S&P 500 VIX Short-Term Futures ("VXX"), which is tied to the market's "fear index," meaning the price fluctuates with the stability of the market. Using

3

the Investors' accounts, the manager sold naked call options for VXX, thereby selling the right to buy VXX at a predetermined price until the date that the option expired. If the market remained stable, the price of VXX would remain stable, the options would not be exercised, and the Investors would make money. However, if the market became volatile, the price of VXX would increase, the options would be exercised, and the Investors would lose money.

The manager executed the trades through the Investors' portfolio margin accounts with the Broker. In general, portfolio margin accounts have enhanced risk. For example, when buying securities on margin, an investor can borrow money from his broker to purchase the securities. While this enables the investor to purchase larger amounts than possible without the money loaned by the broker, it also increases the risk of loss. If the price of the security falls, the investor owes the broker for those losses. Because of the significant risks, the Financial Industry Regulatory Authority ("FINRA") prohibits trades of certain high-risk securities through portfolio margin accounts, including trades of VXX. *See* FINRA Rule 4210(g).

From the time the Investors opened their accounts with the Broker, the Investors made significant profit from a variety of investment decisions, including by sale of their call options for VXX. On August 19, 2015, the Investors' accounts were 100% in cash with no open investment positions. The Saroops had $520,450.40 in their joint account and Sofis had $500,529.48 in his account. After August 19, the investment manager began once again trading VXX call options. The Broker executed these trades through the Investors' accounts.

4

On August 24, 2015, the Dow Jones Industrial Average underwent what was then the largest one-day drop in its history. Given the Broker's execution of the manager's investment strategy, the value of the Investors' accounts fell by 80%. Because the value of the accounts fell below requirements for the amount needed to maintain a portfolio margin account, the Broker began auto-liquidating the accounts, pursuant to the parties' contracts. Through this process, the Broker sold the entire value of the accounts but could not recoup the full loss. Ultimately, the Investors owed $384,400 to the Broker.

The Investors filed a claim with FINRA's arbitration division, seeking to recover their substantial losses from the Broker. The Investors asserted nine causes of action — breach of contract, promissory estoppel, violation of state securities statutes, commercially unreasonable disposition of collateral, negligence, negligent and intentional misrepresentation, unjust enrichment, and vicarious liability. The Investors did not assert a private cause of action based on the FINRA rules. In addition to seeking damages, the Investors requested attorneys' fees. The Broker counterclaimed, seeking payment of the debt and attorneys' fees. As was their prerogative, the parties declined to request a reasoned decision from the arbitrators. *See* FINRA Rule 12904(g)(1).

A three-member arbitration panel found for the Investors. The arbitrators first set forth the many "causes of action" brought by the Investors. The panel then awarded the Investors "the value of their accounts on August 19, 2015 ($520,450.40 to the Saroops and $500,529.48 to Sofis)." In reaching this conclusion, the arbitrators did not specify which cause of action formed the basis of the Broker's liability to the Investors. The lack of

5

explanation is consistent with the fact that no party requested a reasoned decision, and so the arbitrators were under no obligation to provide the rationale for the award.

The arbitration panel then dismissed the Broker's counterclaim. Despite not needing to provide a rationale, the arbitrators noted the counterclaim's dismissal was "based on [the Broker's] violation of FINRA Rule 4210 as further explained in regulatory notice 08-09." The panel further stated that "[t]he securities placed in the portfolio margin account were not eligible for that account based on these rules and regulations."

After setting forth its conclusions as to liability, the arbitrators specified the precise breakdown of all damages, interest, costs, and fees. In addition to compensatory damages, the panel required the Broker to pay attorneys' fees to the Investors "pursuant to the parties' agreement." At the end of the list of monetary determinations, the arbitration panel stated, "Any and all claims for relief not specifically addressed herein, including punitive damages, are denied."

The Broker moved to vacate the arbitration award in federal court, and the Investors cross-moved to confirm the award. The district court held a hearing, during which it voiced substantial criticism of the arbitration process, including its belief that "a reasoned judge and jury can deal with things in a much more intelligent way." In a subsequent written opinion, the court concluded that because it was "unable to determine which of the nine claims filed by [the Investors] was the source of liability," and it found the damages amount "baffling," it could neither vacate nor confirm the award. The court remanded the claim to the same arbitrators for an additional "brief explanation." The Investors attempted to appeal the court's order, but we dismissed the appeal as interlocutory.

6

Upon remand to the arbitrators, they issued a modified award. The modified award repeated the liability findings from the original award. It then appended the following explanation for its application of FINRA Rule 4210 to the Broker's counterclaim:

> [The Broker's] position that the Panel should not enforce a FINRA rule amounts to saying that FINRA should provide an opportunity for investors to commit financial suicide by investing in securities that are ineligible for inclusion in a portfolio margin account. To ignore a FINRA rule by the Panel would defeat the purpose of FINRA.

The arbitrators also added that the damages awarded to the Investors stemmed from the cash amounts that "were subsequently invested in securities that were ineligible for investment in portfolio margin accounts." Thus, the panel again did not explicitly identify which of the nine causes of action formed the basis of the Broker's liability.

The Broker returned to district court and moved to vacate the modified arbitration award. The Investors cross-moved to confirm the award. The district court held another hearing and again criticized the arbitration process. The court explained that it was "just astounded at the jackleg operation that I see here. I don't know why anybody would agree to have these people [the arbitrators] do anything." By written order, the court granted the Broker's motion to vacate the award in favor of the Investors and remanded the Broker's counterclaim to a new panel of arbitrators. The court reasoned that the arbitrators had based the Broker's liability to the Investors on FINRA Rule 4210, which was "a manifest disregard of the law because the law is clear that there is no private right of action to enforce FINRA rules."

7

The Investors timely appealed. "We review the district court's findings of fact for clear error and its conclusions of law, including its decision to vacate an arbitration award, *de novo*." *Raymond James Fin. Servs., Inc. v. Bishop*, 596 F.3d 183, 190 (4th Cir. 2010).

## II.

The Investors contend that the district court erred in three independent ways: by remanding the original arbitration award for clarification, by vacating the modified arbitration award, and by remanding only the Broker's counterclaim to a new arbitration panel for reconsideration. Given that the district court erred in vacating the modified award, we need not address the Investors' other contentions.

The district court vacated the modified award because, in its view, the arbitrators manifestly disregarded the law. "A court may vacate an arbitration award under the manifest disregard standard only when a plaintiff has shown that: (1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the arbitrator refused to apply that legal principle." *Jones v. Dancel*, 792 F.3d 395, 402 (4th Cir. 2015).\*

---

\* The parties dispute the test for demonstrating a manifest disregard of the law. The Investors argue that, as part of the second prong set forth above, a party seeking to vacate an arbitration award must demonstrate that the arbitration panel was "aware of the law, understood it correctly, found it applicable to the case before [it], and yet chose to ignore it in propounding [its] decision." *Long John Silver's Rests., Inc. v. Cole*, 514 F.3d 345, 349 (4th Cir. 2008) (quoting *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 149 (4th Cir. 1994)). As the Broker notes, recent Fourth Circuit opinions have not articulated this particular formulation for demonstrating the arbitrator's knowledge. *See Jones*, 792 F.3d at 402; *Wachovia Secs., LLC v. Brand*, 671 F.3d 472, 481 (4th Cir. 2012). Because the Broker fails to show the violation of any clearly defined law (and therefore is not entitled to vacatur of the award), we need not reach the question of whether the Broker would need additional proof of the arbitration panel's knowledge to succeed in vacating the award.

8

The party seeking to vacate an arbitration award bears a "heavy burden." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235 (4th Cir. 2006) (quoting *Remmey*, 32 F.3d at 149). A "court will set [the arbitral] decision aside only in very unusual circumstances." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995). Limited judicial review is "needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008). A more searching review would "'render informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process' and bring arbitration theory to grief." *Id.* (alteration and citations omitted) (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003)). "When parties consent to arbitration, and thereby consent to extremely limited appellate review, they assume the risk that the arbitrator may interpret the law in a way with which they disagree." *Wachovia*, 671 F.3d at 478 n.5.

III.

With the above principles in mind, we turn to the Broker's contentions that the arbitrators manifestly disregarded the law in finding the Broker liable for the Investors' losses, in imposing damages, and in awarding attorneys' fees.

A.

The modified arbitration award stated that the Investors "are awarded the value of their accounts on August 19, 2015 ($520,450.40 to the Saroops and $500,529.48 to Sofis)," but the award did not explicitly state which cause of action formed the basis of the Broker's liability, given that no party requested a reasoned award. After finding the Broker liable

9

to the Investors, the award then dismissed the Broker's counterclaim "based on Respondent's violation of FINRA Rule 4210" and further noted the importance of adhering to the Rule.

The Broker argues that the arbitration panel's invocation of the FINRA Rule in rejecting the Broker's counterclaim means that the panel predicated the award to the Investors on a private cause of action under the Rule. Despite the fact that the Investors never asserted such a cause of action, the Broker urges us to so conclude because the award states, "Any and all claims for relief not specifically addressed herein, including punitive damages, are denied." According to the Broker, this sentence indicates that the FINRA Rule is the only plausible cause of action undergirding liability because it is the only theory the arbitrators expressly endorsed, albeit in denying the Broker's counterclaim.

But the Broker overlooks the distinction between "causes of action" and "claims for relief" as those terms are used in the award. The arbitration award expressly refers to theories of liability as "causes of action." By contrast, the award uses the phrase "claims for relief" to refer to requests for particular remedies. Thus, the phrase "claims for relief" occurs in the section of the award describing the breakdown of damages and costs, and the arbitrators used "punitive damages" as an example of a claim for relief. Consequently, the denial of "claims for relief not specifically addressed" constitutes a rejection of other remedies, not a description of the predicate of liability. *Cf. Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018) ("We usually presume differences in language like this convey differences in meaning." (internal quotation marks omitted)). The arbitration

panel simply did not state which cause of action provided the basis of its award to the Investors.

The Broker, then, must show that it would be manifest disregard of the law to enforce all causes of action asserted by the Investors. This it cannot do. It would certainly not be manifest disregard of the law to premise liability on breach of contract. As the Broker conceded during oral argument, parties may incorporate the FINRA rules into a contract. Oral Arg. at 35:00–:18; *see also Allstate Life Ins. Co. v. BFA Ltd. P'ship*, 287 Conn. 307, 315 (2008) ("When parties execute a contract that clearly refers to another document, there is an intent to make the terms and conditions of the other document a part of their agreement, so long as both parties are aware of the terms and conditions of that other document."). The parties' contracts here state, "All transactions are subject to rules and policies of relevant markets and clearinghouses, and applicable laws and regulations." This, of course, includes the publicly available FINRA rules. *See FINRA Rules*, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules (last visited July 28, 2020). As such, the clause could well be read as incorporating the FINRA rules, making a violation of the rules a breach of the parties' contracts.

Even if this is not the only interpretation of the contracts, it suffices given our deferential review. "[N]either misapplication of principles of contractual interpretation nor erroneous interpretation of the agreement in question constitutes grounds for vacating an [arbitration] award." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 194 (4th Cir. 1998). Indeed, "'[i]t is not enough to show that the arbitrator committed an error — or even a serious error.' . . . [A]n arbitral decision 'even arguably construing or

11

applying the contract' must stand, regardless of a court's view of its (de)merits." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (alterations omitted) (first quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010); then quoting *E. Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 62 (2000)). Imposing liability based on a contractual obligation to comply with the FINRA rules is, at the very least, an arguable interpretation of the parties' contracts. And the Broker executed trades of VXX on the Investors' portfolio margin accounts, in clear violation of FINRA Rule 4210. Thus, the arbitrators' imposition of liability against the Broker is not in manifest disregard of the law.

B.

The Broker next argues that the arbitration panel manifestly disregarded the law by imposing damages in the amount of the Investors' accounts on August 19, 2015. Under Connecticut law, which the parties agree governs their contracts, "contract damages are awarded to place the injured party in the same position as he would have been in had the contract been fully performed." *Bertozzi v. McCarthy*, 164 Conn. 463, 468 (1973). Arguably, at least, the award placed the Investors in the position they would have been if the contracts had been properly performed after August 19, and so the Investors did not profit from the Broker's breach of contract but were simply returned to the status quo.

Again, this is not the only reading of the law, or perhaps even the best. But "a district court may not overturn an arbitration award 'just because it believes, however strongly, that the arbitrators misinterpreted the applicable law.'" *Jones*, 792 F.3d at 401 (quoting *Wachovia*, 671 F.3d at 478 n.5); *see also Qorvis Commc'ns, LLC v. Wilson*, 549

12

F.3d 303, 310, 312 (4th Cir. 2008) (noting that the Federal Arbitration Act "*mandate[s]* substantial deference to awards" and affirming confirmation of award where arbitrator did not "compute damages irrationally"); *Upshur Coals Corp. v. United Mine Workers*, 933 F.2d 225, 229 (4th Cir. 1991) ("An arbitration award is enforceable 'even if the award resulted from a misinterpretation of law, faulty legal reasoning or erroneous legal conclusion' . . . ." (quoting *George Day Constr. Co. v. United Bros. of Carpenters Local 354*, 722 F.2d 1471, 1479 (9th Cir. 1984))).  As our friend in dissent has explained, our province is not to determine the merits of the dispute between the parties "but rather to determine only whether the arbitrator did his job — not whether he did it well, correctly, or reasonably, but simply whether he did it." *Yuasa, Inc. v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*, 224 F.3d 316, 321 (4th Cir. 2000) (internal quotation marks omitted).

## C.

Finally, the Broker contends that the arbitration panel manifestly disregarded the law by awarding the Investors attorneys' fees.  The contracts permit the Broker to seek attorneys' fees but do not provide any such right for the Investors.  However, Connecticut law makes such attorneys' fees provisions reciprocal where a consumer enters into a contract "primarily for personal, family or household purposes."  Conn. Gen. Stat. § 42-150bb.  It is not manifest disregard of the law to find that the Investors opened their accounts for personal and family use, and that therefore these contracts fall within the statute's reach.  *See Rizzo Pool Co. v. Del Grosso*, 240 Conn. 58, 71 (1997).

13

## IV.

In sum, the district court erred in vacating the modified award. The prolonged proceedings in this case — two arbitration awards, two district court orders, and two federal appeals — illustrate the need to avoid a "cumbersome and time-consuming judicial review process" that would "bring arbitration theory to grief." *Hall St.*, 552 U.S. at 588 (quoting *Kyocera*, 341 F.3d at 988); *see also Stolt-Nielsen*, 559 U.S. at 685 (naming "lower costs, greater efficiency and speed" as "benefits of private dispute resolution"). Without appropriate deference to arbitrators, the costs of vindicating rights drastically increase, threatening to foreclose yet another avenue of relief for ordinary consumers who routinely enter contracts with mandatory arbitration provisions. The modified award must be confirmed.

For the foregoing reasons, the judgment of the district court is vacated, and the case is remanded with instructions to confirm the modified arbitration award.

*VACATED AND REMANDED WITH INSTRUCTIONS*

NIEMEYER, Circuit Judge, dissenting:

After their investment accounts incurred significant losses, three investors initiated arbitration proceedings against their online brokerage firm, Interactive Brokers LLC, pursuant to the rules of the Financial Industry Regulatory Authority ("FINRA"). They claimed that Interactive Brokers was legally responsible for their losses. The FINRA arbitration panel ruled in favor of the investors and awarded them compensatory damages equal to the value of their accounts on a particular date without explaining why that value constituted damages. Upon review of that award, the district court remanded the case to the arbitration panel for clarification of the damages calculation. The panel then explained in a modified arbitration award that it had pegged damages to the value of the investors' accounts on the particular date *because it lacked evidence about the performance of the accounts prior to that date*, thus effectively conceding that it made no effort to calculate damages consistent with any legal theory. On further review, the district court vacated the award, leading to this appeal.

While judicial review of arbitration awards is, to be sure, "severely circumscribed," this case presents that rare circumstance where the award must be vacated because the arbitrators acted outside the bounds of any governing legal principles. *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998). Rather than calculating the damages that would have restored the investors to the position they would have been in but for Interactive Brokers' wrongdoing, the arbitration panel issued an award based solely and arbitrarily on the value of the investors' accounts on a given date. No legal principle allowed for such a determination; indeed, it was divorced entirely from the

15

pertinent facts and from any legal theory. I would thus affirm the district court's order vacating the modified arbitration award on the basis that the arbitration panel manifestly disregarded the law.

I

Husband and wife Rohit and Preya Saroop opened an account with Interactive Brokers in June 2012, and George Sofis opened an account with the firm in October 2012. Both the Saroops and Sofis hired the same independent, third-party investment manager to manage their accounts. At the request of their investment manager, the Saroops converted their account into a portfolio margin account in January 2015, and Sofis converted his account into a portfolio margin account by July 2015. Like other types of margin accounts, a portfolio margin account allows investors to trade not only using their personal funds, but also using funds borrowed from a broker. The amount of funds that may be borrowed for trading in a portfolio margin account is calculated using a sophisticated algorithm, generally resulting in greater leverage than is available in other types of margin accounts and, correspondingly, greater risk. To help mitigate this risk, investors must maintain a minimum amount of equity in their portfolio margin accounts.

According to the Saroops and Sofis, "immediately after [their] accounts were approved for [p]ortfolio [m]argin," their investment manager used the greater leverage to begin trading options on a particular exchange-traded note — iPath S&P 500 VIX Short-Term Futures ("VXX") — that was tied to market volatility. On August 24, 2015 — after the investment manager had been executing such trades in the Saroops' portfolio margin

16

account for some eight months and in Sofis's account for at least one month — a drop in the Dow Jones Industrial Average caused the value of the accounts to decrease by approximately 80 percent. As a result, the accounts no longer satisfied the minimum maintenance requirements for portfolio margin accounts, triggering Interactive Brokers' "auto-liquidation" procedures. Through this process, Interactive Brokers sold the entire remaining value of the investors' accounts for an amount that nonetheless left the firm with a loss of approximately $384,400.

In an attempt to recoup their own losses, the Saroops and Sofis initiated FINRA arbitration proceedings against Interactive Brokers, claiming that Interactive Brokers' policies and practices caused the substantial decrease in the value of their accounts. Among the forms of relief requested, the investors sought damages in an amount between $1,000,000 and $3,000,000. Interactive Brokers filed a counterclaim seeking damages equal to the amount of the investors' debt — i.e., the $384,400 shortfall from the accounts' liquidation.

After a five-day hearing, the three-member arbitration panel returned a monetary award in favor of the investors totaling over $1,500,000 in "damages" and attorneys' fees. Although neither party had requested the panel to give an "explained decision" pursuant to FINRA Rule 12904(g), the panel nonetheless stated the following:

> The Claimants are awarded the value of their accounts on August 19, 2015 ($520,450.40 to the Saroops and $500,529.48 to Sofis). Respondent's Counterclaim was dismissed based on Respondent's violation of FINRA Rule 4210 as further explained in regulatory notice 08-09. The securities placed in the portfolio margin account were not eligible for that account based on these rules and regulations.

17

Proceeding in the district court, Interactive Brokers filed a motion to vacate the arbitration award on various grounds, and the investors filed a counter-motion to have the award confirmed. The district court denied both motions, instead remanding the case to the arbitration panel for clarification. Specifically, the court determined that the award was "not a reasoned one," explaining that the award had not identified "which of the . . . claims filed by Claimants was the source of liability" and that the court could not "concoct a scenario where the amount of compensatory damages awarded . . . makes sense." The court continued:

> Of course, it is possible the arbitrators had a valid reason for pinning the damages award to the value of the Claimants' account[s] on August 19, 2015. It is also possible the arbitrators simply made a mistake in applying the legal principles governing damages. Or, perhaps the panel manifestly disregarded the law of damages because it was easier than calculating the proper figure, or because they wished to punish Interactive. Two of those scenarios would require the award to be affirmed. The third would require vacatur. But, in the words of the Claimants themselves, "it is simply impossible to discern . . . what legal theories or causes of action the Panel considered and accepted or rejected when finding liability." The Court agrees.

(Internal citations omitted).

On remand, the arbitration panel returned a modified award which purported to explain the damages determination. It stated:

> *There was no evidence of profits or losses* in securities ineligible for portfolio management accounts from the time that the parties signed the portfolio management agreements and the parties' accounts' net asset values, all cash on August 19, 2015. *Therefore, the panel could not consider what happened prior to the investment of cash on August 19, 2015* in the portfolio management accounts.
>
> The damages set forth above stem from the amounts, all cash, on August 19, 2015, which were subsequently invested in securities that were ineligible for investment in portfolio margin accounts.

(Emphases added).  Again, Interactive Brokers filed a motion in the district court to vacate the award, and again the investors filed a motion to confirm it.  Ultimately, the district court vacated the award on the ground that the arbitration panel had manifestly disregarded the law by basing its finding of liability against Interactive Brokers on the violation of a FINRA rule.  According to the district court, liability could not be based solely on Interactive Brokers' violation of a FINRA rule because "the law is clear that there is no private right of action to enforce FINRA rules."  The district court then reinstated only Interactive Brokers' counterclaim for consideration before a new arbitration panel.  This appeal followed.

II

It is a longstanding cardinal principle that compensatory damages "shall be the result of the injury alleged and proved, and that the amount awarded shall be precisely commensurate with the injury suffered, neither more nor less."  *Birdsall v. Coolidge*, 93 U.S. 64, 64 (1876).  Accordingly, a "factfinder is not entitled to base a judgment on speculation or guesswork."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969).  But in this case, the arbitration panel's measure of damages fell far short of even guesswork, reflecting instead a complete abdication of its responsibility.

As an initial matter, I conclude that the district court did not err in remanding the original arbitration award back to the panel for clarification.  In the original award, the arbitration panel indicated that the investors' damages equaled the value of their accounts on a particular date — August 19, 2015.  And while the panel was not required to explain

19

why it calculated damages by pegging them to the value of the investors' accounts on that date, the explanation it did provide led the district court to observe that "[t]he amount of damages awarded by the arbitrators does not correspond to any [discernible] theory of liability." I agree with the court's observation and thus conclude that the court's remand for clarification was appropriate.

On remand, the arbitration panel did clarify how it had arrived at its damages figure, thereby revealing that it had ignored the law of damages. Explaining that it "could not consider what happened prior to the investment of cash on August 19, 2015 in the portfolio management accounts" because there was "no evidence of profits or losses" prior to that date, the panel forwent entirely any attempt to quantify the harm attributable to Interactive Brokers' wrongdoing. Instead of requesting evidence sufficient to make a damages determination or taking some other corrective action, the panel merely selected a date and decreed that the investors' damages equaled the value of their accounts on that date. As the district court had foreshadowed, the panel essentially confirmed that it had "manifestly disregarded the law of damages because it was easier than calculating the proper figure." This is not a mere misinterpretation of applicable law; it is an outright refusal to apply any law in the first instance. In short, the arbitration panel abdicated its role as factfinder and disregarded the basic legal principles governing damages, resulting in an impermissible and extralegal award.

The majority nonetheless affirms the damages award based on its incomprehensible view that there is a reasonable explanation for the arbitration panel's decision to pin damages to the value of the investors' accounts on a particular date. *See ante* at 12–13.

20

First, the majority parses the language of the modified arbitration award to conclude that the arbitration panel did not specify the basis for Interactive Brokers' liability. *Id.* at 10–11. Then it concludes that one such permissible basis would be breach of contract. *Id.* at 11. Specifically, the majority posits that the FINRA Rules — which prohibit trades of VXX in portfolio margin accounts — were incorporated by reference into the investors' contracts with Interactive Brokers and that Interactive Brokers' allowance of such trades amounted to contractual breach. *Id.* at 11–12. With a legal theory thus identified, the majority then simply upholds the damages award because "[a]rguably, at least, [it] placed the Investors in the position they would have been [in] if the contracts had been properly performed after August 19," without providing any explanation for the legal significance of that date. *Id.* at 12.

Accepting, for purposes of discussion, a contract theory of liability, Interactive Brokers was obligated to perform its contractual obligations for the duration of its relationship with the investors, not just for the period after August 19. And both the investors and Interactive Brokers acknowledge that VXX trades occurred in the portfolio margin accounts *prior* to August 19. Indeed, according to the investors, their financial advisor began executing such trades "immediately after [their] accounts were approved for [p]ortfolio [m]argin" — i.e., as early as January 2015 for the Saroops and by July 2015 for Sofis. Similarly, Interactive Brokers explains that "[b]y [the time the investors had converted their accounts to portfolio margin accounts], the Traders' investment strategy focused on making margin sales of naked call options for [VXX] Exchange Traded Notes." Even the majority seems to recognize that VXX trades occurred prior to August 19, stating

21

"[a]fter August 19, the investment manager began *once again* trading VXX call options." *Ante* at 4 (emphasis added). And if the theory of liability is that Interactive Brokers breached its contracts with the investors by permitting these VXX trades to be made, then the impact of any such trades executed prior to August 19 would have to be included when computing the damages award that would restore the investors *to the position they would have been in but for the breach*.

Thus, even under the majority's breach of contract theory, the award does not reflect an acceptable calculation of damages. Indeed, the arbitration panel specifically explained that, due to insufficient evidence, *it did not consider profits and losses in the portfolio margin accounts between the accounts' creation and August 19*. As such, it would have been impossible for the panel to arrive at a damages figure that would have restored the status quo. For instance, if the allegedly improper VXX trades executed prior to August 19 had caused the investors' accounts to *gain* in value, then the arbitration panel's failure to consider those trades in calculating damages would have resulted in an improperly inflated award.

At bottom, neither breach of contract nor any other theory of liability would have permitted compensatory damages to be tied to the value of the investors' accounts on a single, specific date, with no consideration of what came before or after. Conceding that it could not calculate the proper damages figure for lack of evidence, the arbitration panel opted for the easier course — an award by simple fiat. That course, however, was unmoored to any legal principle governing damages and was therefore in manifest disregard of the law.

22

I would thus affirm the district court's order vacating the modified arbitration award, albeit on somewhat different grounds.  I would, however, remand *both* the investors' claims *and* Interactive Brokers' counterclaim to a new arbitration panel for reconsideration.