# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2665

_____

Charles P. Nelson; Darlene F. Nelson, on behalf of themselves and all others similarly situated

*Plaintiffs - Appellants*

v.

American Family Mutual Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 13, 2018
Filed: August 2, 2018

_____

Before GRUENDER, ERICKSON, and GRASZ, Circuit Judges.

_____

ERICKSON, Circuit Judge.

In 1990, Charles P. Nelson and Darlene F. Nelson ("the Nelsons") purchased a Gold Star Homeowners Insurance Policy ("Gold Star Policy" or "Policy") from American Family Mutual Insurance Company ("American Family") on their home in Monticello, Minnesota. The Policy provided that the Nelsons could recover up to 120% of the policy limit in the event of a total loss, so long as they purchased

coverage no less than the replacement cost of the house. Each year, American Family provided the Nelsons with a replacement cost estimate, which was adjusted from the prior year based on inflation. In 2007, however, the estimate spiked approximately $140,000, the apparent result of a change in the designated "Quality Grade" of the house. Four years later, the Nelsons complained to their agent for the first time that their coverage was too high. In response, American Family reduced coverage for 2011 but refused to refund the Nelsons' claimed overcharges incurred from 2007 to 2010.

The Nelsons filed an amended complaint against American Family, asserting breach of contract, negligent misrepresentation, and violation of Minnesota's consumer fraud statutes.[1] Each of the claims is based on the notion that the company misrepresented the replacement cost of the property, which caused the Nelsons to pay excessive premiums. The district court[2] granted summary judgment in favor of American Family. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.      Background

In 1990, the Nelsons moved into a newly built lake home in Monticello, Minnesota. They purchased a Gold Star Homeowners Insurance Policy from their long-time American Family agent, Ron Baker. The Policy covers loss or damage to their home ("Coverage A") and personal property ("Coverage B"). The Nelsons chose the Gold Star Policy because it is a replacement policy that covers the total loss

---

[1]The original complaint also included claims of unjust enrichment or, in the alternative, negligence *per se*. The district court granted American Family's motion to dismiss these claims. The Nelsons did not appeal the dismissal, and these claims are not before the court.

[2]The Honorable Susan R. Nelson, United States District Judge for the District of Minnesota.

of their property up to 120% of the Coverage A amount as long as they insure their house and detached garage to a minimum of 100% of the replacement cost.

American Family uses a third-party software tool, 360Value, as its "residential building cost guide" under the Policy. 360Value is software designed to generate replacement cost estimates. When an insured purchases a policy from American Family, the agent collects information about the home, including square footage, age, foundation type, exterior type, number and size of rooms, type of fixtures, and number of doors and windows. 360Value also uses a "Quality Grade" field, which refers to the caliber of the home and its various components, to price individual components used in the building's construction. Users select from grades of economy, standard, above average, custom, or premium. Once the user enters all of the information into 360Value, the program generates an estimate of the home's replacement cost.

The Nelsons' Policy explains that the replacement cost of the home can change over time and that it is the insured's responsibility to make certain that the replacement cost in the renewed policy is accurate. Specifically, the Policy provides that each year when the Policy renews, American Family "will increase the insurance . . . at the same rate as the increase in the Residential Building Cost Index" to adjust for inflation. The Nelsons are also required to notify American Family when remodeling or additions to the house would increase the replacement cost value by $5,000 or more. The Gold Star endorsement goes on to state:

> **Our** residential building cost guide may be used to develop an estimated replacement cost based on general information about **your** dwelling. It is developed from researched costs of construction materials and labor rates. This is the minimum amount for which to insure **your** dwelling. The actual cost to replace **your** dwelling may be different. **We** do not guarantee that this figure will represent the actual cost to replace **your** dwelling. **You** are responsible for selecting the appropriate amount of

coverage. **You** may wish to obtain a detailed replacement cost appraisal or estimate from a contractor. **You** may select a coverage amount equal to that appraised value or that cost of construction, if the amount is greater than the replacement cost as estimated by **our** residential building cost guide, and **we** agree to that amount.

When they first moved into the home, the Nelsons purchased a policy that provided that the full replacement cost was $150,000. By 2006, inflation had pushed the replacement cost estimate provided by American Family to $240,200. Prior to December 2006, American Family gave the home a Quality Grade of "standard" when inputting data into the 360Value software.

In December 2006, Baker apparently changed the Quality Grade from "standard" to "above average," generating a new 360Value report on the Nelsons' home with a replacement cost estimate of $379,841.97. In January 2007, Baker sent the Nelsons a letter and declaration page informing them that the Coverage A amount would increase to $380,000 starting at the next renewal. The increase in coverage took effect in February 2007. In the following years, full replacement cost coverage on the home rose—due to inflation—to the following amounts: $427,500 in 2008, $439,000 in 2009, and $450,900 in 2010. During these years, the Nelsons never complained about the amount of coverage on their home or the cost of their premiums.

In 2009, American Family employed Millennium Information Services ("Millennium") to conduct exterior-only surveys of insured properties to determine if any were overinsured or underinsured. Millennium's task was to complete a survey of each property and use the information from the survey to generate a replacement cost estimate report on 360Value (collectively, the "Millennium Reports"). American Family expected agents to review each Millennium Report, assess whether the current coverage amount was accurate, and, if necessary, discuss coverage with the insured. An underwriter would also review the file when Coverage A was less than 95% of the

Millennium Report's estimated replacement cost or coverage exceeded the estimate by 50% or more.

In September 2010, Millennium performed an exterior-only survey of the Nelsons' home. Millennium determined that the Quality Grade of the home was "standard" and ran a 360Value report that estimated the replacement cost at $315,023.55. In December 2010, after reviewing the Nelsons' Millennium Report, an unidentified American Family representative determined that the amount of Coverage A on the home at that time—$450,000—was acceptable. Because the Millennium Report suggested that replacement cost coverage in 2010 was in excess by 43%, underwriter review was not triggered.

In January 2011, American Family sent the Nelsons a renewal declarations page listing an estimated replacement cost of $454,500. In February, Mr. Nelson called Baker and made the first complaint that the replacement coverage on the home was too high. Baker agreed to meet with the Nelsons in their home the next day to discuss the complaint. At the end of the meeting, Baker crossed out the Coverage A amount and wrote in $315,000, never mentioning the Millennium Report.[3] Mr. Nelson testified that when he asked Baker how he came up with the figure, Baker replied "I just know," attributing this insight to his years in the business. American Family's records indicate that on March 7, 2011, Coverage A was reduced to $315,000, which was "OK . . . PER 12-05-10 MILL SURVEY INFO." When American Family refused to refund the alleged overcharges from 2007 to 2010, the Nelsons brought this action.

---

[3]The Nelsons did not see or know about the Millennium Report until after the commencement of this action.

## II.   Discussion

A district court's grant of summary judgment is reviewed *de novo*, "viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party." Odom v. Kaizer, 864 F.3d 920, 921 (8th Cir. 2017) (quoting Jones v. Frost, 770 F.3d 1183, 1185 (8th Cir. 2014)). Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Id. (citing Jones, 770 F.3d at 1185). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

### A.   Breach of Contract

The Nelsons assert that American Family had a contractual obligation "to state an accurate estimate of replacement cost in its policy renewal contracts" and that it breached its obligation. Under Minnesota law, a breach-of-contract claim has four elements: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd., 703 F.3d 1104, 1107 (8th Cir. 2013) (quoting Parkhill v. Minn. Mut. Life Ins. Co., 174 F. Supp. 2d 951, 961 (D. Minn. 2000)). "In a breach-of-contract action against an insurance company, the plaintiff has the burden to prove that the insurer violated the terms of its insurance policy." Glass Serv. Co. v. Progressive Specialty Ins. Co., 603 N.W.2d 849, 852 (Minn. Ct. App. 2000) (citing D.H. Blattner & Sons, Inc. v. Firemen's Ins. Co. of Newark, 535 N.W.2d 671, 675 (Minn. Ct. App. 1995)).

Nothing in the Policy imposes on American Family a contractual obligation to make objectively reasonable or accurate replacement cost estimates. The relevant

-6-

policy provisions allow for an increase in replacement cost for inflation or home improvements, but no provision prohibits increases made for some other reason. Nor does American Family promise in the Policy that its replacement cost estimates will be accurate. To the contrary, the Gold Star endorsement explicitly places the burden on the policyholder to ensure that the appropriate amount of coverage is purchased:

> The actual cost to replace **your** dwelling may be different. **We** do not guarantee that this figure will represent the actual cost to replace **your** dwelling. **You** are responsible for selecting the appropriate amount of coverage.

Despite the policy language, the Nelsons now claim that the contract necessarily incorporates a duty created by Minnesota statutes. The Policy states that "[i]f any part of this policy is contrary to a law of the state in which the described property is located, [American Family] agree[s] to alter that part of [the] policy and make it conform with that state law." Minn. Stat. § 65A.01, subd. 3, the Minnesota standard fire insurance policy, requires that every policy state certain specified provisions and subject matter in a particular wording and order, including "the insurable value(s) of any building(s) or structure(s) covered by the policy or its attached endorsements." Minn. Stat. § 65A.09, subd. 1, prohibits knowingly issuing a policy in excess of replacement cost and penalizes violators by requiring them to "forfeit to the state . . . double the premium collected on the policy." The Nelsons argue that these statutes create a contractual obligation to provide accurate replacement cost estimates.

We decline to incorporate a statutory duty into the Policy where the contractual provisions about replacement cost are unambiguous and where the relevant insurance statutes do not create a private right of action. See Palmer v. Ill. Farmers Ins. Co., 666 F.3d 1081, 1086 (8th Cir. 2012) (affirming dismissal of breach-of-contract claims alleging violation of an automobile insurance statute because the claims were an "attempt to circumvent Minnesota's administrative remedies and create a private right

of action when the legislature has not"); <u>Burgmeier v. Farm Credit Bank of St. Paul</u>, 499 N.W.2d 43, 47 (Minn. Ct. App. 1993) (provision that the contract was "subject to" the Farm Credit Act—which lacks a private right of action—was "insufficient to create rights or obligations in the parties, and cannot support a breach of contract action"). Because American Family lacked a contractual obligation to provide the Nelsons with accurate replacement cost estimates, the Nelsons' breach-of-contract claim cannot survive summary judgment.

### B.     Negligent Misrepresentation

The Nelsons also assert that American Family negligently misrepresented the replacement cost of their home in policy renewal documents. Under Minnesota law, to prevail on their negligent misrepresentation claim, the Nelsons must establish: "(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplie[d] false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information." <u>Williams v. Smith</u>, 820 N.W.2d 807, 815 (Minn. 2012).

We need not decide whether American Family owed the Nelsons a duty of care requiring objectively reasonable replacement cost estimates nor whether American Family breached that duty. Regardless of any breach of duty, no genuine dispute exists as to justifiable reliance upon the estimates. As discussed above, the Policy expressly states that American Family does not guarantee its replacement cost estimate will be the actual replacement cost in the event of a covered loss and that it is up to the policyholder to select the proper amount of coverage. The Policy also suggests that the policyholder "obtain a detailed replacement cost appraisal or estimate from a contractor." Under these circumstances, the Nelsons cannot show justifiable reliance upon American Family's replacement cost estimates, and summary judgment was proper on their negligent misrepresentation claim.

## C.    Consumer Fraud

The final issue on appeal is whether the district court erred in granting summary judgment for American Family on the Nelsons' claim under Minnesota's Consumer Fraud Act ("MCFA").  The MCFA prohibits the use of "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise."  Minn. Stat. § 325F.69.  Minn. Stat. § 8.31, subd. 3a, creates a private cause of action for a violation of the MCFA.  To prevail, a plaintiff must demonstrate that (1) the defendant engaged in conduct prohibited by the statute; (2) the plaintiff relied upon the representations (there is no requirement, however, that the reliance be justifiable); and (3) the plaintiff was damaged thereby.  Group Health Plan, Inc. v. Philip Morris Inc., 621 N.W.2d 2, 12 (Minn. 2001).  See also Wiegand v. Walser Auto. Grps., Inc., 683 N.W.2d 807, 812–13 (Minn. 2004) (internal citations omitted) ("We held in *Group Health* that reliance is a component of the causal nexus requirement for a private consumer fraud class action under Minn. Stat. § 8.31, subd. 3a.  But a private consumer fraud class action does not necessarily require the justifiable reliance standard of common law fraud.").

American Family's policy notified the Nelsons that replacement cost value was based on a "residential building cost guide."  The unambiguous policy terms provided: (1) the replacement cost estimate was not guaranteed to be accurate; (2) the policyholders were responsible for selecting the appropriate amount of coverage; and (3) the policyholders may consider obtaining their own replacement cost appraisal or estimate from a contractor.  The protections the Nelsons argue American Family failed to provide—a lower replacement cost estimate and refund for purported overcharges from 2007 to 2010—are not among the protections for which the Nelsons bargained by agreeing to the terms of the Gold Star Policy.  The Nelsons can point to no promise, misrepresentation, or false statement made by American Family, let alone one that they relied upon, justifiably or unjustifiably, in deciding to purchase

-9-

or renew the Policy. Any claim that the replacement cost estimate was a false statement is contrary to the express provision of the Policy that clearly states that the estimate may or may not be correct and that the insured should independently verify the proper amount of coverage.

It is also noteworthy that the Nelsons never presented any evidence that the replacement estimates for the years 2007 to 2010 were false. This failure to develop an appropriate record is fatal. Without any evidence of a misrepresentation or false statement that the Nelsons relied on, there is insufficient evidence to create a submissible case that American Family violated the MCFA. See In re St. Jude Med., Inc., 522 F.3d 836, 839 (8th Cir. 2008) (reiterating that even after Group Health, a plaintiff who alleges damages caused by deceptive, misleading, or fraudulent statements must establish both causation and reliance). Summary judgment was proper on the Nelsons' MCFA claim.

**III.   Conclusion**

For the foregoing reasons, we affirm the judgment of the district court.

_____