# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2706

_____

Gary Luis; Caryl Luis; Gary A. Mentz; Michael J. Vitse; Merri L. Vitse,
individually and on behalf of all others similarly situated

*Plaintiffs - Appellants*

v.

RBC Capital Markets, LLC

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 22, 2020
Filed: December 28, 2020

_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

_____

BENTON, Circuit Judge.

Gary Luis, Caryl Luis, Gary A. Mentz, Michael J. Vitse, and Merri L. Vitse are former clients of RBC Capital Markets, LLC. Through RBC, the clients invested in reverse convertible notes (RCNs). The clients, individually and for a purported class, sued RBC for breach of contract. The clients alleged that RBC breached its duties to comply with Financial Industry Regulatory Authority (FINRA) rules and to know the clients' investment profiles. RBC moved for summary judgment,

asserting that the plain language of the Client Account Agreement did not create either duty. The district court[1] granted summary judgment to RBC. The clients appeal. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

The Agreement governs the relationship between RBC and each client. Each client received the Agreement and agreed to abide by its terms. *See Luis v. RBC Capital Markets, LLC*, 401 F. Supp. 3d 817, 823 (D. Minn. 2019).

The Agreement lists the terms each client agrees to. The terms "I" and "me" refer to the client. An introductory paragraph and Paragraph 16 describe the laws and regulations for transactions in the clients' RBC accounts:

> In consideration of [RBC] continuing to or now and hereafter opening an account or accounts (collectively, the "Account") for the purchase and sale of securities and commodities for me, or in my name, I agree that all transactions with respect to any such Account shall be subject to the following terms . . . .

> **16. APPLICABLE LAW AND REGULATIONS**

> All transactions in my Account shall be subject to all applicable laws and the rules and regulations of all federal, state and self-regulatory agencies, including, but not limited to, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the New York Stock Exchange, Inc., ("NYSE"), FINRA, the Board of Governors of the Federal Reserve System, and the constitution, rules, and customs of the exchange or market (and the related clearing facility or entity) where executed, as the same may be amended or supplemented from time to time.

*Id.*

---

[1]The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

When opening a new account with RBC, each client completes a Client Account Information form. RBC uses it to collect each client's basic financial information. Clients provide their age, occupation, investment experience, years investing, estimated tax bracket, annual income, net worth, and investment objective, among other things. A client may describe their investment objective as "preservation of principal/income," "balanced/conservative growth," "growth," "aggressive growth," or "speculation." *Id.* The clients here did not describe their investment objectives as aggressive or speculative. RBC's internal guidelines require its brokers to "look through this 'Client Account Information,' in addition to other information gleaned through the broker's own investigation, and determine whether RCNs are 'suitable' for a client under RBC's *internal* rules . . . ." *Id.* (citation omitted) (emphasis in original).

RBC purchased RCNs on behalf of the clients. RCNs are "a complex 'structured financial product,' that combine the consistent interest rate payments of a bond with the inherent riskiness of a stock." *Id.* at 820. "[W]hen an investor buys an RCN, they are not buying a traditional bond—they are *betting* that a reference stock (or basket of stocks) will stay at a certain price level, and are then receiving above-market 'interest rate payments' in exchange for taking one side of that bet." *Id.* (emphasis in original). Because of a substantial risk of loss of the principal, RCNs are "perhaps the riskiest" structured financial product available to retail investors. *Id.*

FINRA, a self-regulatory organization created under the Securities and Exchange Act, regulates the financial industry with approval by the Securities and Exchange Commission. *See Bank of Am. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 909 (8th Cir. 2010), *citing* **15 U.S.C. § 78s**. FINRA issues guidance on industry practices such as the sale and management of structured products like RCNs.

FINRA has the authority to "pass rules with the force of law." ***Luis***, 401 F. Supp. 3d at 821. FINRA's issued guidance are called Notices to Members (NTMs).[2]

FINRA Rule 2111(a), the suitability rule, sets brokers' obligations in making transactions or investments for a client:

> A member [RBC] or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

FINRA's NTMs detail the suitability rule. NTM 05-59 gives guidance on brokers' "obligations when selling structured products." **FINRA, Notice to Members 05-59**. It says that brokers "should consider whether purchases of some or all structured products should be limited to investors that have accounts that have been approved for options trading." *Id.* For investors not approved for options trading, brokers "should develop other comparable procedures designed to ensure that structured products are only sold to persons for whom the risk of such products is appropriate." *Id.* Suitability for structured products "must be determined on an investor-by-investor basis, with reference to the specific facts and circumstances of each investor." *Id.* To accomplish this, the brokers must "supervise and maintain a supervisory control system" and "train associated persons." *Id.*

NTM 10-09 repeats the substance of NTM 05-59 and applies it to RCNs. **FINRA, Notice to Members 10-09**. NTM 12-03 requires "heightened supervision"

---

[2]FINRA Rules and NTMs are available on FINRA's website, https://www.finra.org.

-4-

of complex products like RCNs, including that brokers "should have formal written procedures to ensure that their registered representatives do not recommend a complex product to a retail investor before it has been thoroughly vetted." **FINRA, Notice to Members 12-03**.

FINRA enforces its rules through administrative proceedings and arbitration. *See* **FINRA Rule 8310** (giving FINRA the authority to impose sanctions on broker-members for violations of FINRA rules); **FINRA Rule 12200** (giving a client the authority to compel arbitration for disputes between the client and the broker-member). In 2015, after investigating the sale of RCNs to clients, FINRA entered into a consent decree with RBC. Between 2008 and 2012, RBC approved "approximately 364 [RCN] transactions in approximately 218 customer accounts" that were unsuitable for those customers under RBC's internal guidelines on suitability. *Luis*, 401 F. Supp. 3d at 824 (citation omitted). RBC paid a $1,000,000 fine to FINRA and $433,898.10 in restitution to harmed clients. *Id.*

In an earlier case against RBC, the clients asserted claims of common law fraud, fraudulent concealment, violations of the Minnesota Securities Act, common law negligence, breach of fiduciary duty, and breach of contract. *See Luis v. RBC Capital Markets, LLC*, 2016 WL 6022909, at *2 (D. Minn. 2016). The clients' claims centered around the allegation that "RBC engaged in a series of actions designed to hide the true risk of [RCNs] from investors, while pushing them on individuals who had expressly indicated an unwillingness to partake in options trading." *Id.* The district court dismissed the clients' claims because they were precluded by the Securities Litigation Uniform Standards Act of 1998. *See id.* at *7.

The clients again sued RBC for breach of contract, alleging that RBC failed to comply with FINRA rules and guidance by not following internal guidelines on RCNs and by pushing RCNs on ineligible clients. *Luis*, 401 F. Supp. 3d at 827. They argued that Paragraph 16 of the Agreement created a contractual duty that RBC comply with FINRA rules. The clients also argued that the Agreement and Client Account Information form together created an implied duty that RBC "know your

customer." The district court granted summary judgment to RBC, ruling that the Agreement did not create a duty that RBC comply with FINRA rules and that the clients did not have a cause of action to enforce them. *Id.* at 832.

This court reviews de novo the district court's grant of summary judgment. ***Torgerson v. City of Rochester***, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. ***Id.***, *quoting* **Fed. R. Civ. P. 56**.

II.

This dispute is governed by Minnesota law. This court must "predict how the Minnesota Supreme Court would resolve the issue." ***Harleysville Ins. Co. v. Physical Distribution Servs., Inc.***, 716 F.3d 451, 457 (8th Cir. 2013) (citation omitted). To do so, this court follows the "fundamental principles of Minnesota law." ***Id.*** at 459. This court must give unambiguous words their "plain, ordinary, and popular meaning," read contract provisions "in context with all other relevant provisions," and use "common sense" in interpreting language. ***Id.***, *quoting* ***General Cas. Co. of Wisconsin v. Wozniak Travel, Inc.***, 762 N.W.2d 572, 575 (Minn. 2009); ***Mutual Serv. Cas. Ins. Co. v. Wilson Twp.***, 603 N.W.2d 151, 153 (Minn. Ct. App. 1999); *and* ***West Bend Mut. Ins. Co. v. Armstrong***, 419 N.W.2d 848, 850 (Minn. Ct. App. 1988).

The clients and RBC agree that the Agreement is unambiguous. *See* ***Enervations, Inc. v. Minnesota Mining & Mfg. Co.***, 380 F.3d 1066, 1069 (8th Cir. 2004) ("Under Minnesota law, the interpretation of an unambiguous contract is a question of law and is reviewed de novo on appeal.") (citation omitted). *Cf.* ***Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.***, 913 N.W.2d 687, 692 (Minn. 2018) ("A contract's terms are not ambiguous simply because the parties' interpretations differ."). "When the language is clear and unambiguous, [this court] enforce[s] the agreement of the parties as expressed in the language of the

contract." ***Storms, Inc. v. Mathy Const. Co.***, 883 N.W.2d 772, 776 (Minn. 2016) (citation omitted). For unambiguous contract language, this court "should not rewrite, modify, or limit its effect by a strained construction." ***Residential Funding Co., LLC v. Terrace Mortg. Co.***, 725 F.3d 910, 916 (8th Cir. 2013), *quoting* ***Travertine Corp. v. Lexington–Silverwood***, 683 N.W.2d 267, 271 (Minn. 2004) (en banc).

In the Agreement, clients "agree" that all transactions in their accounts "shall be subject to" FINRA rules. ***Luis***, 401 F. Supp. 3d at 823. According to the clients, the unambiguous plain language of the Agreement creates two contractual duties. First, the clients argue that the "I agree" and "subject to" language should be interpreted to create a contractual duty that RBC comply with FINRA rules. Second, the clients argue that the Agreement and Client Account Information form together implicitly create the duty that RBC "know your customer."

A.

The clients argue that the Agreement's unambiguous plain language creates a contractual duty that RBC comply with FINRA rules. The Agreement states: "I agree that . . . [a]ll transactions in my Account shall be subject to all applicable laws and the rules and regulations of all federal, state and self-regulatory agencies, including . . . FINRA . . . ." ***Id.*** From this language, the clients argue that RBC had a duty and breached it by not having adequate procedures for selling RCNs and by selling them to ineligible clients.

1.

The "subject to" language in Paragraph 16 does not create a contractual duty. Rather, it is an acknowledgment by the clients that RBC will comply with FINRA rules.

Courts examining similar language reach the same conclusion. In the *Burgmeier* case, a contract between Burgmeier and a Farm Credit Bank stated that Burgmeier's stock purchased in connection with a mortgage was "held by [the Bank] as collateral security for the payment of said loan, *subject to* all the provisions of the Farm Credit Act of 1971." **Burgmeier v. Farm Credit Bank of St. Paul**, 499 N.W.2d 43, 45 (Minn. Ct. App. 1993) (emphasis added). Like the client here, Burgmeier argued that this language created a contractual duty that the Bank comply with the Act, and supported a breach of contract action. **Id.** at 47.

The Minnesota Court of Appeals rejected Burgmeier's argument. According to the court, the unambiguous language—the mortgage was "subject to" the Act— was "insufficient to create rights or obligations in the parties, and cannot support a breach of contract action." **Id.**; **Nelson v. Am. Family Mut. Ins. Co.**, 899 F.3d 475, 479, 480–81 (8th Cir. 2018) (adopting and quoting *Burgmeier*'s holding); **Palmer v. Illinois Farmers Ins. Co.**, 666 F.3d 1081, 1086 (8th Cir. 2012) (same). *See* **Production Credit Ass'n of Worthington v. Van Iperen**, 396 N.W.2d 35, 36 (Minn. Ct. App. 1986) (refusing to incorporate the Farm Credit Act into a contract that stated the loan was "governed by" the Act). *See generally* **Bureau of Engraving, Inc. v. Fed. Ins. Co.**, 5 F.3d 1175, 1176 (8th Cir. 1993) (stating that the "decisions of the Minnesota intermediate appellate court are not binding on [this court], 'but they are persuasive authority, and we must follow them when they are the best evidence' of Minnesota law."), *quoting* **Garnac Grain Co. v. Blackley**, 932 F.2d 1563, 1570 (8th Cir. 1991).

The Second Circuit's unpublished opinion in *Gurfein* analyzed similar language and reached the same conclusion as Minnesota law. **Gurfein v. Ameritrade, Inc.**, 312 Fed. Appx. 410 (2d Cir. 2009). Gurfein's contract with its broker Ameritrade stated:

> *In consideration of Ameritrade handling options transactions for my account, I am aware of and agree as follows: . . .* All my option transactions are *subject to* the rules and regulations of the Options

Clearing Corporation, the Chicago Board Options Exchange or the appropriate options exchange, and [FINRA's predecessor].

*Id.* at 413 (second emphasis added).

Examining this "unambiguous language," the court determined that the provision "memorialize[d] only Gurfein's acknowledgment that her trades are subject to applicable rules and regulations." *Id.* The "subject to" language was a notice provision, putting "Gurfein on notice that her electronic trades are governed by various entities' regulatory rules." *Id.* This language did not, however, "incorporate into the contract the rules and regulations of those outside regulatory bodies. Nor does it impose any contractual obligations on Ameritrade." *Id.*

Rejecting the clients' factual distinctions between this case and *Gurfein*, the district court properly relied on *Gurfein* to conclude that "there is no indication in this provision that the broker, RBC, is agreeing to do anything on the client's behalf." *Luis*, 401 F. Supp. 3d at 830–31 ("Although *Gurfein* is an unpublished opinion, the Second Circuit's reasoning has proved persuasive" to courts in subsequent decisions.), *citing* **Hauptman v. Interactive Brokers, LLC**, 2018 WL 4278345, at *7 (S.D.N.Y. 2018); **Lanier v. BATS Exch., Inc.**, 105 F. Supp. 3d 353, 367 n.6 (S.D.N.Y. 2015), *aff'd on other grounds*, 838 F.3d 139 (2d Cir. 2016); **Appert v. Morgan Stanley Dean Witter, Inc.**, 2009 WL 3764120, at *4 (N.D. Ill. 2009) (distinguishing, at *4 n.2, the case the clients' rely on—*Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848 (S.D.N.Y. 1995)), *aff'd*, 673 F.3d 609 (7th Cir. 2012); *and* **Knights of Columbus Council 3152 v. KFS BD, Inc.**, 791 N.W.2d 317, 324–26 (Neb. 2010).

The clients, conversely, invoke *Interactive Brokers LLC v. Saroop*, 969 F.3d 438 (4th Cir. 2020). There, the contract between a broker and investors stated: "All transactions are *subject to* rules and policies of relevant markets and clearinghouses, and applicable laws and regulations." *Id.* at 444 (emphasis added). Those "rules" included FINRA rules. *Id.* The investors asserted multiple causes of action with

FINRA's arbitration panel, including one for breach of contract, seeking to recover losses from the broker. *Id.* at 441.

The arbitration panel granted an award to the investors, but did not specify which cause of action supported the broker's liability. *Id.* The district court vacated the award, reasoning that "the arbitrators had based the Broker's liability to the Investors on FINRA Rule 4210, which was 'a manifest disregard of the law because the law is clear that there is no private right of action to enforce FINRA rules.'" *Id.* at 442, *quoting* ***Interactive Brokers LLC v. Saroop***, 2018 WL 6683047, at *8 (E.D. Va. 2018), *vacated and remanded*, 969 F.3d 438. On appeal, the Fourth Circuit disagreed. According to the court, the contract provision "could well be read as incorporating the FINRA rules, making a violation of the rules a breach of the parties' contracts." *Id.* at 444.

The Fourth Circuit's holding is not persuasive here. *See* ***Jaben v. United States***, 333 F.2d 535, 538 (8th Cir. 1964), *aff'd*, 381 U.S. 214 (1965) (stating that this court may choose not to defer to another circuit's holding where there are "impelling and cogent reasons" to not follow that case). The Fourth Circuit interpreted the contract in the context of an arbitration award. That court was confined to the deferential "manifest disregard of the law" standard: even an "erroneous interpretation of [an] agreement" does not constitute a ground to vacate an arbitration award. ***Interactive Brokers***, 969 F.3d at 444. Qualifying its reading that the contract incorporated FINRA rules, the court stated that the contract "could well be read" this way, which was "at the very least, an arguable interpretation . . . ." *Id.* That opinion stands only for the proposition that the arbitration panel's reading of the contract as incorporating FINRA rules was not a manifest disregard of the law. The *Interactive Brokers* case does not contradict *Burgmeier* or *Gurfein*. Regardless, *Burgmeier* and *Gurfein* accurately predict how the Minnesota Supreme Court would interpret the "subject to" language.

2.

In addition to the "subject to" language in Paragraph 16, this court must "construe a contract as a whole and attempt to harmonize all of its clauses." ***Storms***, 883 N.W.2d at 776. Paragraph 16 must be read in conjunction with the key phrase "I agree" in the introductory paragraph.

The "I agree" phrase puts the introductory paragraph and Paragraph 16 in the first person, from the client's perspective. This signals that the client is making an acknowledgment of the terms and conditions in the Agreement's following paragraphs. The language does not signal that RBC is creating or accepting a contractual duty. *See **Gurfein***, 312 Fed. Appx. at 413 ("This section, drafted in the first person, memorializes only Gurfein's acknowledgment that her trades are subject to applicable rules and regulations.").

The clients counter by quoting other paragraphs in the Agreement that they claim are acknowledgments. They assert that if Paragraph 16 were an acknowledgment, it would use phrases like "I understand" or "I represent, warrant and covenant." *See*, *e.g.*, **Client Account Agreement** at 5 (stating: "I understand that RBC WM may in its sole discretion prohibit or restrict trading of securities or substitution of securities in any of my Accounts."). The clients do not cite any authority suggesting that acknowledgments can be described only with their preferred language.

B.

The clients argue that the Agreement and the Client Account Information form together create a contractual duty that RBC know its customers' needs, risk tolerance, and investment objectives. The clients claim that RBC breached its duty to "know your customer" by failing to adequately collect and use the information in the Client Account Information forms.

The plain language of the Agreement does not create a duty that RBC "know your customer." The clients agree that no express language in the Agreement says RBC has this duty. Instead, they assert that this duty is implied, from the Agreement's language that RBC collects client information so that it can better serve clients, and from the Client Account Information form's collection of clients' investment objectives.

The clients ask this court to rewrite unambiguous language and add a new provision to the Agreement. Minnesota law "does not permit [this court] to entertain [the clients'] strained reading of the contract." **Terrace Mortg.**, 725 F.3d at 916 (Minnesota law does not permit courts to "rewrite, modify, or limit [a contract's] effect by a strained construction"). This court will not create a duty to "know your customer" not supported by the unambiguous text. *See **In re Stevenson Assocs., Inc.**, 777 F.2d 415, 421 (8th Cir. 1985) (stating that "courts cannot remake contracts or imply provisions through judicial interpretation."), *citing **Telex Corp. v. Data Prod. Corp.**, 135 N.W.2d 681, 687 (Minn. 1965).

The clients invoke a district court's rejection of a broker's assertion that a "know your customer" provision was definitional, not a contractual duty. **Royal Alliance Assocs., Inc. v. Mora**, 2016 WL 926907 (N.D. Cal. 2016). There, former clients alleged, among other things, that the broker breached its contract with them. **Id.** at *1. A FINRA arbitration panel found for the clients, but provided no reasoning. **Id.** at *4.

The broker moved to vacate the award, arguing that the panel based it on a "know your customer" provision and that the contract had no such provision. **Id.** The district court denied the motion, ruling that the panel's decision was not "completely irrational" and did not "manifestly disregard the law." **Id.** at *5. The contract, in "clear language," expressly stated the "know your customer" rule and required the broker to comply with it. **Id.** at *6. The provision was not merely "definitions of terms used throughout" the contract, as asserted by the broker. **Id.**

The *Royal Alliance* case is inapposite. The Agreement here does not unambiguously state the "know your customer" rule or that RBC will comply with it.

Any duty that RBC know its customers is based in FINRA Rules, not the Agreement. *See* **FINRA Rule 2090** (the rule, titled "Know Your Customer," states: "Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer."). As discussed, RBC does not have the contractual duty to comply with FINRA rules. RBC did not breach a contractual duty to know its customers.

\* \* \* \* \* \* \*

The judgment is affirmed.

_____