# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 20-3312

———————————————

Principal Securities, Inc.

*Plaintiff - Appellee*

v.

Sanjeev Agarwal; Rajshri Agarwal; Technochem International, Inc.

*Defendants - Appellants*

——————————

Appeal from United States District Court
for the Southern District of Iowa - Central

——————————

Submitted: April 14, 2021
Filed: January 31, 2022

——————————

Before SMITH, Chief Judge, COLLOTON and ERICKSON, Circuit Judges.

——————————

ERICKSON, Circuit Judge.

Principal Securities, Inc. ("PSI") commenced this action in the Southern District of Iowa to enjoin an arbitration proceeding filed with the Financial Industry Regulatory Authority ("FINRA"). The claimants in the underlying arbitration are Dr. Sanjeev Agarwal and his wife Rajshri Agarwal, individually and on behalf of their company Technochem International, Inc. (collectively "the Agarwals"). The district

court[1] found that the Agarwals were involved in joint business ventures with PSI's former registered representative, not securities transactions governed by FINRA, and thus there was no basis to compel PSI to participate in a FINRA arbitration proceeding. The Agarwals appeal the grant of injunctive relief enjoining them from proceeding with arbitration. We affirm.

## I.  BACKGROUND

According to the Agarwals' Statement of Claim filed with FINRA, Dr. and Mrs. Agarwal reside in Ames, Iowa. They are the sole owners of a nearly 50-year-old company, Technochem, International, Inc., that builds plants for the extraction and refining of essential oils, vegetable oils, and animal fats as well as the distillation of glycerin and fermentation. Technochem's principal place of business is Boone, Iowa. Dr. Agarwal is the president of Technochem and has a Bachelor of Science degree in chemical engineering, a Master of Business Administration degree, and a Ph.D. in International Business and Marketing.

PSI is a member of FINRA and registered with the Securities and Exchange Commission. John Krohn previously worked as a financial advisor who was associated with PSI from March 1996 through December 31, 2016. In 2014, Krohn, Dr. Agarwal, and two other business partners formed Glycerin Group LLC d/b/a KemX Global ("KemX"). The purpose of KemX was to build and operate industrial glycerin and biofuel refining plants. Dr. Agarwal was KemX's president and co-chief executive officer.

---

[1]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa, now retired.

Pursuant to an operating agreement for KemX executed in 2015, K4 Enterprises, LLC ("K4") owned 50 percent of KemX, Dr. and Mrs. Agarwal owned 25 percent through Technochem, and a third business partner, Mark Merritt, owned the remaining 25 percent. K4 was an investment company owned by Krohn and a business partner.

On February 2, 2016, Dr. Agarwal and Merritt, acting on behalf of KemX, offered Krohn the position of chief financial officer for KemX. In the written offer, Dr. Agarwal and Merritt recognized that Krohn was fiercely loyal to his employer, Principal Financial Group, which was one of the traits they admired most. In addition to proposing a salary, Dr. Agarwal and Merritt told Krohn that Krohn would have the ability to acquire ownership interests in KemX and any other related operations that Dr. Agarwal and Merritt developed. Krohn declined the employment offer.

KemX completed construction of its first biofuel refinery in 2017. In 2015 and 2016, while the plant was being constructed, Technochem lent KemX over $4.8 million worth of equipment and construction costs. The sum was recognized as debt on KemX's balance sheet. Due to construction cost overruns, Technochem provided an additional $1.7 million in cash that was also recognized as debt on KemX's books. In June 2019 when KemX was sold, KemX was indebted to Technochem in an approximate amount of $9.3 million. The Agarwals purportedly lost the money they lent to KemX, but have not identified the purchase of any securities in connection with this project.

In 2016, Dr. Agarwal began investing in a different venture—Spotlight Innovation, Inc. ("Spotlight"), a company in which Krohn held an approximate 38% ownership. In August 2016, the Agarwals invested $250,000 in Spotlight stock; in December 2016, they invested another $100,000; and in April 2017 (after Krohn had left PSI), the Agarwals loaned Spotlight $400,000. Spotlight was a development stage company purportedly involved in identifying, validating, and financing

-3-

healthcare-focused companies founded for the purpose of commercializing intellectual property. The parties dispute the worth of Spotlight. The Agarwals contend that after it became apparent Spotlight lacked any legitimate business prospects, Krohn continued to facilitate acquisitions, used K4 to provide debt financing and make loans to Spotlight, and continued to solicit investors to fund his dubious venture. PSI, in contrast, asserts the Spotlight entities are not sham entities and all appear to be active going concerns with research agreements with universities and a hospital, a product registered with the Food and Drug Administration, and, at least one, commercially available product. This dispute, however, is immaterial to our analysis of the dispositive issue before us.

The Agarwals' principle claim is that PSI failed to supervise the outside business activities of Krohn. PSI has denied the allegations, contending it acted consistent with its policies and FINRA Rules that required Krohn to disclose private securities transactions and outside business activities. See FINRA Rules 3270 & 3280. PSI asserts that during the 20 years Krohn was associated with PSI, PSI audited Krohn's activities 14 times in an effort to ensure compliance with securities regulations and PSI's policies. There is evidence in the record demonstrating that Krohn requested approval for the initial Spotlight purchase and he notified PSI when he was appointed a member of the Spotlight Board. PSI maintains that its approval and oversight with regard to Spotlight as well as Krohn's other business activities was appropriate based on Krohn's representations. Again, resolution of this dispute is immaterial and unnecessary for us to resolve.

Krohn consented to the imposition of sanctions related to private securities transactions and outside business activities that are the subject of this litigation and underlying FINRA arbitration. With the advice of counsel, on April 16, 2018, Krohn signed a letter of acceptance, waiver, and consent ("AWC") that settled a number of alleged violations of FINRA Rules 2010, 3270 & 3280. R. Doc. 13-9. The violations included: (1) engaging in four outside business activities without giving PSI prior

written notice, and (2) conducting more than two dozen purchases of ten companies' securities outside the scope of his employment with PSI and without notifying PSI of these transactions, his role in them, and whether he received or expected to receive selling compensation. Id. at p. 2. FINRA accepted the AWC on May 29, 2018. Id. at p. 5.

The Agarwals contend that for nearly a decade Krohn controlled the finances and operations of various companies and ventures. In this capacity Krohn allegedly solicited approximately $40 million from dozens of investors and then shuffled the investors' money from venture to venture to satisfy other investors, banks, and other creditors until the ventures ultimately all collapsed. In their Statement of Claim, the Agarwals allege FINRA has jurisdiction because PSI knew about Krohn's activities but failed to supervise or place reasonable controls on his other business activities, including KemX and Spotlight. The Agarwals seek compensatory damages in the amount of $10 million, as well as interest, attorneys' fees, expert fees, forum fees, punitive damages, and treble damages.

The Agarwals appeal the district court's decision granting a preliminary and permanent injunction and enjoining their FINRA arbitration proceeding.

## II. ANALYSIS

"We review a district court's ultimate ruling on a preliminary injunction for abuse of discretion, though we review its underlying legal conclusions de novo." Home Instead, Inc. v. Forance, 721 F.3d 494, 497 (8th Cir. 2013). A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous. See Laredo Ridge Wind, LLC v. Neb. Pub. Power Dist., 11 F.4th 645, 649 (8th Cir. 2021). We find no abuse of discretion here.

-5-

The Federal Arbitration Act, 9 U.S.C. § 4, "permits a federal court to compel arbitration based on an arbitration clause in a written contract, but does not permit a court to enjoin arbitration based on an issue's nonarbitrability." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1099 n.8 (11th Cir. 2004). In other words, "'wrongful arbitration,' is not a cause of action for which a party may sue." Meierhenry Sargent LLP v. Williams, 992 F.3d 661, 665 (8th Cir. 2021) (Colloton, J., concurring) (quoting Klay, 376 F.3d at 1098, 1112). The Agarwals have not raised an issue regarding the district court's authority to enter an injunction enjoining arbitration. Because the issue is not jurisdictional or in the nature of a jurisdictional bar, the Agarwals have waived the cause-of-action issue and we decline to address it. Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."); see Brnovich v. Democratic Nat'l Comm., 594 U.S. __, 141 S. Ct. 2321, 2350 (2021) ("Because no party argues that the plaintiffs lack a cause of action here, and because the existence (or not) of a cause of action does not go to a court's subject-matter jurisdiction, this Court need not and does not address that issue today.") (citation omitted)

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (cleaned up). Lacking an explicit agreement to arbitrate, the Agarwals contend that they have the right to compel PSI to arbitrate their claims under the rules promulgated by FINRA.

"FINRA, a self-regulatory organization created under the Securities and Exchange Act, regulates the financial industry with approval by the Securities and Exchange Commission." Luis v. RBC Cap. Mkts, LLC, 984 F.3d 575, 577 (8th Cir. 2020). FINRA enforces its rules through administrative proceedings and arbitration. See FINRA Rule 8310 (providing FINRA the authority to impose sanctions on broker-

members for violating FINRA rules); FINRA Rule 12200 (providing a client the authority to compel arbitration for disputes between the client and broker-member).[2]

While PSI is a member of FINRA, it contends that the Agarwals are not "customers" entitled to compel arbitration under FINRA's Code of Arbitration Procedure for Customer Disputes, FINRA Rule 12000, et seq. In particular, Rule 12200 states:

> Parties must arbitrate a dispute under the Code if:
>
> • Arbitration under the Code is either:
>
>     (1) Required by a written agreement, or
>     (2) Requested by the customer;
>
> • The dispute is between a customer and a member or associated person of a member; and
>
> • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Resolution turns on the second prong, which requires arbitration if requested by "the customer." The FINRA Code defines "customer" in the negative, stating only that "[a] customer shall not include a broker or dealer." FINRA Rule 12100(k). In Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 773 (8th Cir. 2001), the Court declined to interpret "customer" as everyone who is not a broker or a dealer, explaining: "[W]e do not believe that the [FINRA Code][3] requires a member to

---

[2]FINRA Rules are available on FINRA's website, https://www.finra.org

[3]Fleet Boston, 264 F.3d 770, cites to NASD Rule 10301(a), which also required arbitration upon the demand of the customer and is the predecessor of, FINRA Rule 12200.

submit to arbitration in every dispute that involves its business dealings with a non-member." Specifically, the Court construed "customer" to encompass "one involved in a business relationship with [a FINRA] member that is related directly to investment or brokerage services." Id. at 772.

The information in the record makes plain that the Agarwals were business partners with Krohn (and others). In particular, Dr. Agarwal had an active role in KemX, serving as president as well as chief executive officer (along with Merritt). Dr. Agarwal participated in hiring decisions, specifically extending an offer to Krohn to serve as chief financial officer of KemX. When Dr. Agarwal and Merritt sought to recruit Krohn to be KemX's chief financial officer, they recognized the position would be separate and apart from Krohn's practice with PSI. In short, the Agarwals were involved in funding and operating KemX in arms-length business decisions.

There is a dispute about the evidence, or lack thereof, regarding Dr. Agarwal's purchase of a convertible note in 2016 for Spotlight—a company associated with Krohn. Even assuming the facts in a light favorable to the Agarwals, this transaction is insufficient to convert what was an ongoing business partnership in various ventures into a business relationship "related directly to investment or brokerage services," which our precedent requires. See Fleet Boston, 264 F.3d at 772. In particular, the Agarwals have not pointed to evidence demonstrating Krohn provided investment advice or brokerage services during the Spotlight transaction. Nor has Dr. Agarwal pointed to evidence suggesting his decisions were influenced because he thought Krohn was advising him as a result of Krohn's association with PSI. Upon careful review of the record, Dr. Agarwal's purchase of Spotlight debt did not convert his business partnership with Krohn into a customer relationship. The Agarwals and Krohn were, and remained throughout the relevant period, business partners who relied on their own independent expertise when making investment decisions.

## III.  CONCLUSION

FINRA's purpose is not to make a brokerage firm the insurer of failed business ventures.  The Agarwals, relying on their own knowledge and expertise, engaged in arms-length business transactions outside of Krohn's association with PSI that led purportedly to the loss of millions of dollars.  The Agarwals cannot compel arbitration under FINRA Rule 12200 because they have failed to demonstrate that they were Krohn's customers—that is, in a relationship with Krohn that was related directly to investment or brokerage services.

We affirm the district court's decision granting injunctive relief and enjoining the FINRA arbitration proceeding.

_____